SEIDLER, Plaintiff in error, v. STATE, Defendant in error.

*No. State 199. Argued June 4, 1974.—Decided June 28, 1974.*
(Also reported in 219 N. W. 2d 320.)

For the plaintiff in error there were briefs and oral argument by *Anthony K. Karpowitz*, Legal Aid Society of Milwaukee.

For the defendant in error the cause was argued by *Thomas J. Balistreri*, assistant attorney general, with whom on the brief was *Robert W. Warren*, attorney general.

HEFFERNAN, J. Seidler, the defendant, age twenty-two, was baby-sitting for Darlene Witek, the mother of Kelly Lynn, age two, and another child. Prior to October 5, 1971, the date of the death, Seidler had "sat" on a number of occasions. There is no evidence of any prior child abuse by Seidler.

When Kelly Lynn was left with Seidler on the afternoon of October 5, 1971, she was in apparent good health. Seidler gave a statement to the police which recites the chronology of events on the afternoon of the death.

At about 1:30 p. m., Kelly Lynn came into the home with soiled clothing after a bowel accident. Seidler changed her clothes, but stated that he was "mad" at her. He told her to go to her bedroom. However, near the doorway to the bedroom he took "her left arm and threw her in the bedroom. She hit the bottom of the bunk bed hitting the board or the spring flipping over on her back hitting her stomach."

He said that she gasped for air and cried. However, after a short time, she went out to play. At about 2 p. m., Seidler checked on the children and found that she was "sleeping" on the porch. He put her to bed. Upon checking on her again, he found she had thrown up. He changed her clothing, and she again went outside with her brother. Seidler again checked on the children and again found Kelly Lynn was "sleeping." He again brought her in. Later she went outside to play once more. Seidler stated that at about 2:15 p. m. he saw Kelly Lynn fall off of an ash box that was located at the alley behind the home. He said she appeared to lose her balance and fell approximately four feet to the concrete. Seidler put her

to bed, and at 3:30 p. m. found she was "breathing hard." He covered her and left the room. He said she was breathing all right when he left her in the bedroom.

When Kelly Lynn's mother returned at 4 p. m., he told her that the child had fallen off of the ash box. The mother found the child unresponsive. A neighbor gave Kelly Lynn mouth-to-mouth resuscitation, and the emergency ambulance was called. Kelly Lynn was found to be dead upon examination at the hospital at 4:25 p. m.

The trial revealed no facts that would substantially dispute any of the recitals in Seidler's statement.

Dr. Helen Young, the medical examiner of Milwaukee county, testified that a postmortem examination of the child's body had been made. That examination revealed that the cause of death was "hemoperitoneum, due to multiple ruptures of abdominal tissue due to external trauma." She gave the opinion that the external trauma was "force over and above normal applied to tissues." She defined "force" as "some impetus or something either striking the abdomen or the body being propelled and stopping abruptly against a fixed object."

The examination revealed multiple lacerations of the small bowel and other internal injuries. These, the medical examiner stated, caused internal bleeding that eventually distended the abdominal cavity and eventual death.

She testified to a reasonable degree of medical certainty that the injuries were not caused by the fall from the ash box. She testified the injuries could have been caused only by a direct blow with sufficient force to pin or push the bowel up against the spine. Dr. Young was unable to testify that the injuries were caused by but one blow.

Dr. Norbert Enzer, a pathologist, was called by the defendant. He testified that the cause of death was speculative. He stated that he could not say that some of the injuries to the child were caused by the fall from the ash box. He also stated that it was possible and not inconsist-

ent with his findings that the fatal injuries were caused by being thrown against the angle iron frame of the spring or the bedpost of the bunk bed. He said that the injuries could have been caused by two separate trauma or by one.[1]

On this state of facts, we affirm the trial judge's finding that the death of Kelly Lynn Witek was caused by Clarence Seidler's throwing her across the room and hitting some hard surface on the bunk bed with her abdomen.

The burden of proof in a criminal case is upon the state, in a case tried either to a court or to a jury, to prove every essential fact beyond a reasonable doubt.

The test for our review of court findings has been recently stated in *Bautista v. State* (1971), 53 Wis. 2d 218, 223, 191 N. W. 2d 725.

"The burden of proof is upon the state to prove every essential element of the crime charged beyond reasonable doubt. The test is not whether this court or any of the members thereof are convinced beyond reasonable doubt, but whether this court can conclude the trier of facts could, acting reasonably, be so convinced by evidence it had a right to believe and accept as true. A criminal conviction can stand based in whole or in part upon circumstantial evidence. The credibility of the witnesses and the weight of the evidence is for the trier of fact. In reviewing the evidence to challenge a finding of fact, we view the evidence in the light most favorable to the finding. Reasonable inferences drawn from the evidence can support a finding of fact and, if more than one reasonable inference can be drawn from the evidence, the inference which supports the finding is the one that must be

---

[1] Seidler's statement that Kelly Lynn had intermittent periods of consciousness and torpor is not inconsistent with any of the medical testimony. That testimony showed that the bleeding was comparatively slow, would result in a loss of blood pressure and consciousness, and after a period of rest consciousness would be regained. Prompt medical assistance probably would have saved the life of this child.

adopted. Our review of the record in response to a challenge to the sufficiency of the evidence is so limited by these rules."

The evidence elicited, as viewed most favorably in light of the finding made, supports the reasonable inference that it was Seidler's conduct in throwing Kelly Lynn into the bedroom that caused her death. Any disparity in the medical evidence was for the trial judge to reconcile. On the basis of the evidence, the trier of the fact, acting reasonably, could conclude beyond a reasonable doubt that Seidler's conduct was the cause of death.

The fact that Seidler's conduct caused the death of Kelly Lynn does not spell out a case of murder in the second degree.

Second-degree murder is defined by sec. 940.02, Stats.:

"Whoever causes the death of another human being by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, may be imprisoned . . . ."

Wis J I—Criminal, Part II, 1110, points out that:

"The first element of second degree murder requires that the defendant's conduct was imminently dangerous to another, that is, conduct dangerous in and of itself. It must have been conduct inherently and consciously dangerous to life and not such as might casually produce death by misadventure."

This definition derives originally from the language of Mr. Justice LYON in *Hogan v. State* (1872), 30 Wis. 428, and was enlarged upon by Mr. Chief Justice RYAN in *Hogan v. State* (1874), 36 Wis. 226. *Hogan* was a case in which the defendant was found guilty of second-degree murder. The jury found that the defendant did not intend to take the life of another, but struck him with the sharp edge of an axe, causing death. This act, the court said, was one imminently dangerous to life, evincing a

depraved mind regardless of human life and, hence, second-degree murder.

In *Hogan v. State* (36 Wis. 226), Mr. Chief Justice RYAN said, using almost the words of the instructions set forth above:

"The first condition of the statute is, that the act producing death shall be imminently dangerous to others. It has been said that every act producing death must be thus dangerous. Perhaps this is literally true. But the statute does not go on fortuitous or latent danger, but on essential and apparent danger, of the act producing death. The act must be inherently and consciously dangerous to life, not such as casually produces death by misadventure. It must be dangerous in and of itself, as committed and when committed, whether death follow it or not." (Pp. 246, 247)

He went on to say:

"In our view of murder in the second degree, it goes in any case upon constructive intent to kill, intent imputed by law where there is no actual intent to kill." (P. 249)

The definitions of *Hogan* have been incorporated into the recent case of *State v. Dolan* (1969), 44 Wis. 2d 68, 73, fn. 2, 170 N. W. 2d 822, wherein the definitions of "imminently dangerous" and "evincing a depraved mind" were discussed in connection with Criminal Jury Instruction 1345 relating to sec. 941.30, Stats.

We conclude that the admitted facts of this case do not satisfy the accepted definition of conduct "imminently dangerous," particularly when the definition and instruction are scrutinized and it becomes apparent that act itself must be "inherently and consciously dangerous to life and not such as might casually produce death by misadventure."

While Seidler's act causing death constituted some degree of homicide, it is not second-degree murder.

The facts show that Seidler threw the child into the bedroom in the direction of the bed. To do so, he grabbed her and threw her by her left arm. While the evidence shows that she hit either the metal frame of the bed or possibly a bedpost, there is no evidence that Seidler consciously threw her at the hard and unyielding portions of the bed. The statements in the state's brief are misleading in this respect and are unsupported by the record.

The conduct of the defendant has not been shown to be of the type that was inherently dangerous to life. It does not fit the definition of Mr. Chief Justice RYAN, which requires that, for second-degree murder, there be "constructive intent" to cause death.

The seminal case of *Hogan, supra,* is instructive and conclusive. The striking of the victim's face with the sharp edge of an axe was held to furnish evidence of such conduct—of conduct imminently and inherently dangerous to the life of another. The conduct of Seidler, though reprehensible and resulting in death, carries with it no such connotation.

Cases involving sec. 940.02, Stats., and cases arising under other statutes using the phrase, "imminently dangerous," are illustrative of the type of conduct covered by the statutory definition. *Kasieta v. State* (1974), 62 Wis. 2d 564, 215 N. W. 2d 412, conviction of second-degree murder in beating defendant's ex-wife with fists while knowing she suffered from Hodgkin's disease; *State v. Van Ark* (1974), 62 Wis. 2d 155, 215 N. W. 2d 41, conviction under sec. 941.30, for placing homemade bomb in the neck of a car's gas tank; *State v. Weso* (1973), 60 Wis. 2d 404, 210 N. W. 2d 442, conviction under sec. 941.30, for striking at victim and cutting his face with knife; *Austin v. State* (1971), 52 Wis. 2d 716, 190 N. W. 2d 887, second-degree murder conviction for shooting the victim with gun; *State v. Dolan* (1969), 44 Wis. 2d 68, 170 N. W. 2d 822, conviction under sec. 941.30, for

threatening a person while holding a knife to his throat; *State v. Kanzelberger* (1965), 28 Wis. 2d 652, 137 N. W. 2d 419, certiorari denied (1966), 385 U. S. 867, 87 Sup. Ct. 127, 17 L. Ed. 2d 93, second-degree murder conviction for striking victim on head with Indian club; *State v. Johnson* (1940), 233 Wis. 668, 290 N. W. 159, second-degree murder for firing shots into porch and toward street where children were playing; *Montgomery v. State* (1922), 178 Wis. 461, 190 N. W. 105, second-degree murder for killing three pedestrians when he switched into a lane where persons were standing preparatory to boarding a streetcar; *Radej v. State* (1913), 152 Wis. 503, 140 N. W. 21, second-degree murder conviction for pointing gun at victim's head and discharging it.

These cases are illustrative of conduct covered by sec. 940.02, Stats. Throwing a small child in the direction of a bed, though done in a reckless and callous manner, is not consciously such conduct that is imminently dangerous to life or such conduct that carries with it the implied intent to kill.

We believe the conduct, more properly, is embraced by sec. 940.06, Stats.:

"**940.06 Homicide by reckless conduct.** (1) Whoever causes the death of another human being by reckless conduct may be fined not more than $2,500 or imprisoned not more than 5 years or both.

"(2) Reckless conduct consists of an act which creates a situation of unreasonable risk and high probability of death or great bodily harm to another and which demonstrates a conscious disregard for the safety of another and a willingness to take known chances of perpetrating an injury. It is intended that this definition embraces all of the elements of what was heretofore known as gross negligence in the criminal law of Wisconsin."

While Seidler's conduct was not imminently dangerous to life, it created "a situation of unreasonable risk and high probability of death or great bodily harm."

An additional facet of second-degree murder must be proved beyond a reasonable doubt. The conduct must evince a depraved mind regardless of human life. In this respect, too, we believe the proof is insufficient.

This statutory requirement was exhaustively discussed in the recent case of *State v. Weso* (1973), 60 Wis. 2d 404, 210 N. W. 2d 442.

The court said, "A depraved mind must be indifferent to the life of others." (P. 410) Comparing the depraved mind standard to a high degree of negligence [2] and reckless conduct, the court said:

"To constitute a depraved mind, more than a high degree of negligence or recklessness must exist. The mind must not only disregard the safety of another but be devoid of regard for the life of another." (P. 411)

The court, further defining the standard, said:

"A depraved mind is one having an inherent deficiency of moral sense and rectitude. Otherwise it would not prompt an act which in its nature is imminently dangerous to the safety of another. The element of the disregard for life likewise calls for a state of mind which has no regard for the moral or social duties of a human being." (P. 410)

The instruction for sec. 941.30, Stats., approved in *Dolan, supra,* at pages 73 and 74, fn. 2, states:

---

[2] This is the standard used in sec. 940.08, Stats., which provides:

"940.08 **Homicide by negligent use of vehicle or weapon.** (1) Whoever causes the death of another human being by a high degree of negligence in the operation or handling of a vehicle, firearm, airgun, knife or bow and arrow may be fined not more than $1,000 or imprisoned not more than one year in county jail or both.

"(2) A high degree of negligence is conduct which demonstrates ordinary negligence to a high degree, consisting of an act which the person should realize creates a situation of unreasonable risk and high probability of death or great bodily harm to another."

"The depravity of mind referred to exists when the conduct endangering the safety of another demonstrates an utter lack of concern for the life and safety of another and for which conduct there is no justification or excuse."

Contrary to the conclusion reached by the trial judge, we find only that the record demonstrates conduct embraced by sec. 940.06, Stats. Seidler's conduct created a situation of unreasonable risk of harm or of death to Kelly Lynn, but it does not demonstrate a state of mind "devoid of regard for the life of another." *Weso, supra,* page 411.

The trial judge expressed his discomfort with this conclusion that the conduct proved was sufficient to convict of second-degree murder.

At sentencing, he expressed his misgivings when he said:

"It [the crime], in fact, does differ in kind and in substance from other second degree murder cases which this court is familiar with, that psychologically and many other ways it seems to raise a special classification of crime and [second degree murder] is not quite the label that I would put on it. . . ."

This court has had the opportunity to review the record in depth and from a different perspective than did the trial judge. From the record, it is clear that the event that transpired here indeed differs in substance and in kind from second-degree murder. We agree with the trial judge's misgivings and are, under this record, obliged to reverse the judgment and the order denying a new trial on the lesser included offense of homicide by reckless conduct.

*By the Court.*—Judgment and order reversed, and cause remanded, with directions to grant defendant's motion for a new trial.

ROBERT W. HANSEN, J. *(dissenting)*. On appeal, reversal of a criminal conviction is warranted only when

the evidence in support of conviction is so insufficient that it can be said as a matter of law that no trier of facts acting reasonably could be convinced to the degree of certitude the law defines as beyond a reasonable doubt. (*See: Baldwin v. State* (1973), 59 Wis. 2d 116, 121, 122, 207 N. W. 2d 630.)

In the case before us, a two-year-old child died from internal bleeding due to multiple ruptures of abdominal tissue caused by a direct external blow of sufficient force to pin the bowel against the spine. The court, as trier of fact, found that the defendant caused the death of the child, and there is more than sufficient evidence to support that finding. The defendant was convicted of murder in the second degree. That crime is committed by one who causes the death of another human being by conduct imminently dangerous to another and evincing a depraved mind.

The evidence and entirely reasonable inferences to be drawn from it here support the finding that the defendant caused the death of the child by hurling her body with great force from the area of the kitchen door at the metal-framed bunk bed, her body striking that portion of the bunk bed where the metal frame met the wooden back post. The majority opinion holds such throwing of such two-year-old child against such metal frame of a bunk bed, as a matter of law, not to constitute conduct imminently dangerous to such infant and not to evince a depraved mind regardless of infant life.

The trial court, as trier of fact, held that: "The throwing of a two-year-old child a distance into a piece of furniture is obviously imminently dangerous conduct. . . ." While the holding might be challenged as to an assault upon an able-bodied adult, applied either to a two-year-old child or a person enfeebled by old age, the writer sees the conclusion as reasonably to be inferred from the evidence here, including the statement of the defendant as to what he did and how he did it.

As to whether the act of the defendant which caused the death of the child evinced a depraved mind, the definition of that state of mind from a recent decision of this court is pertinent: "To constitute a depraved mind, more than a high degree of negligence or recklessness must exist. The mind must not only disregard the safety of another but be devoid of regard for the life of another. . . . A depraved mind has a general intent to do the acts and the consciousness of the nature of the acts and possible result but lacks the specific intent to do the harm. . . ." (*State v. Weso* (1973), 60 Wis. 2d 404, 411, 412, 210 N. W. 2d 442); also stating, ". . . the qualities of the act as imminently dangerous and envincing a depraved mind regardless of human life are to be found in the act itself and the circumstances of its commission. . . ." (*Id.* at page 409, citing *State v. Weltz* (1923), 155 Minn. 143, 193 N. W. 42.) Here the act itself and the circumstances surrounding it—hurling a two-year-old child a considerable distance at a metal-framed bunk bed, with the degree of force required to severely rupture her viscera—sufficiently supports a trial court finding the act and the circumstances surrounding it did evince a depraved mind regardless of human life. The trial court noted that this case did ". . . differ in kind and in substance from other second-degree murder cases which the court is familiar with. . . ." It is rare, and fortunately so, that a two-year-old child is hurled like a projectile at a metal-framed object with the force required to rupture her viscera. Fortunately so, but the rarity of the occurrence does not here warrant holding as a matter of law that no trier of fact, acting reasonably, could be convinced beyond reasonable doubt that the crime committed was that of murder in the second degree. The writer would affirm.

I am authorized to state that Mr. Justice LEO B. HANLEY joins in this dissenting opinion.