STATE of Wisconsin, Plaintiff-Respondent,

v.

Bruce BLAIR, Defendant-Appellant.†

Court of Appeals

*No. 90–2650–CR. Submitted on briefs May 7, 1991.—Decided July 23, 1991.*

(Also reported in 473 N.W.2d 566.)

†Petition to review denied.

65

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Robert N. Meyeroff* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the briefs of *James E. Doyle,* attorney general, and *Christopher G. Wren,* assistant attorney general.

Before Moser, P.J., Sullivan and Fine, JJ.

FINE, J.   Bruce Blair appeals from a judgment entered on a jury verdict convicting him of first-degree reckless homicide while possessing a dangerous weapon in violation of sections 940.02(1) and 939.63(1)(a)2, Stats. He raises two issues. First, he contends that there was insufficient evidence to support the jury's verdict. Second, he argues that the trial court erroneously precluded him from offering expert testimony concerning the vagaries of eye-witness testimony. We affirm.

I.

Blair was convicted of killing Raymond Harris. Bruce Bullock was the only witness to the incident who testified. Whether there was sufficient evidence for the jury to have found Blair guilty of first-degree reckless homicide turns on an evaluation of Bullock's testimony and the testimony of the physician who did the autopsy on Harris.

66

Bullock testified that at around 8 p.m. on February 22, 1989, he was in the *Shangri-La,* a Milwaukee tavern. Harris, a man whom Bullock had known for several years, was also in the tavern. Bullock left the tavern, and Blair, whom Bullock had also known for a couple of years but to whom he had never spoken, was standing outside. A short time later, Harris left the tavern. Harris was confronted by Blair who, according to Bullock's testimony, cursed Harris. Bullock told the jury what happened next, as Blair and Harris stood just inside the tavern's outer door:

Q  What's the next thing you saw after [Blair] said those words?

A  I seen him put [*sic*] out a gun.

Q  And what did you see [Blair] do with the gun?

A  He started hitting [Harris] with it.

Bullock testified that Blair hit Harris "about" three times on the head with the gun, and that "after about the third hit, the gun went off." According to Bullock, Harris fell down and Blair ran away. Bullock testified that he "panicked" and walked away without helping Harris. There was no testimony as to how Blair was holding the gun or what parts of the gun struck Harris. Indeed, Bullock testified that the gun was small and that he did not even realize that it was a firearm until it discharged.

By stipulation, the preliminary-examination testimony of Dr. John Teggatz, the physician who did the autopsy on Harris, was read to the jury. Dr. Teggatz testified that Harris died from a gunshot wound to his chest, and that the bullet's track had "an extremely steep angle," going "from top nearly straight down through the lung through the heart into the abdomen through por-

tions of the liver and ending in about the upper left abdomen." Additionally, Dr. Teggatz told the jury that Harris "had a realtively [sic] minor head trauma," which he described as "one actual cut, a laceration as well as surrounding abrasions" of the scalp tissue without "any internal brain injuries." He testified that Harris' head injuries were contemporaneous with his death, were caused "by a blunt object," and were "consistent" with his being struck with the "butt of a gun."

## II.

A. *Sufficiency of the evidence.* Blair's argument that there was not enough evidence to support the jury's verdict centers on his contention that hitting Harris in the head three times with a loaded pistol, which then discharged, is not within the purview of first-degree reckless homicide, section 940.02(1), Stats. (1989–90).[1] Section 940.02(1), Stats. (1989–90), provides:

> Whoever recklessly causes the death of another human being under circumstances which show utter disregard for human life is guilty of a Class B felony.

[1]Blair argues that "[t]he only hypothesis consistent with [the testimony of Bullock and Dr. Teggatz] is that [Blair] was holding the gun by the barrel and struck [Harris] in the head with the handle of the gun three times" and that "[t]he third time [Harris] was hit with the gun, the gun accidently discharged." We agree that this is one conclusion the jury could have drawn from the evidence. Blair's hypothesis is not the only possible scenario, however. For example, the jury could have also concluded that Blair held the gun by its grip and hit Harris in a descending, arcing motion with the barrel pointed down. This latter hypothesis would explain the bullet's trajectory. We must accept any reasonable hypothesis that supports the conviction. *See State v. Poellinger,* 153 Wis. 2d 493, 507, 451 N.W.2d 752, 757–758 (1990).

This provision, enacted in 1988, became effective on January 1, 1989. 1987 Wis. Act 399 secs. 472zkco, 3204(57)(ag). It was part of a general revision of the homicide laws in Wisconsin, and resulted from a project undertaken by the Judicial Council.[2] Dickey, Schultz & Fullin, *The Importance of Clarity in the Law of Homicide: The Wisconsin Revision,* 1989 Wis. L. Rev. 1323, 1325, 1351. As the Judicial Council Committee note to section 940.02(1), Stats. (1989-90), indicates, first-degree reckless homicide is "analogous to the prior offense of 2nd-degree murder" that was prohibited by section 940.02(1), Stats. (1985-86). Judicial Council Committee Note, 1988, sec. 940.02, Stats. Under section 940.02(1), Stats. (1985-86), it was a Class B felony to cause someone's death "[b]y conduct imminently dangerous to another and evincing a depraved mind, regardless of human life." The change in language was prompted by a perceived lack of clarity in the old second-degree murder statute:

> The concept of "conduct evincing a depraved mind, regardless of human life" has been a difficult one for modern juries to comprehend. To avoid the mistaken connotation that a clinical mental disorder is involved, the offense has been recodified as aggravated reckless homicide. The revision clarifies that a subjective mental state, i.e., criminal recklessness, is required for liability. See s. 939.24.[3] The aggravating

---

[2]The Judicial Council is a twenty-member body whose duties include proposing court-related legislation to the legislature. Section 758.13(1), (2)(f), Stats.

[3]Section 939.24, Stats. (1989-90), was also enacted as part of the revision of Wisconsin's law of homicide. 1987 Wis. Act 399 sec. 472zkbg; *see* Dickey, Schultz & Fullin, 1989 Wis. L. Rev. at 1325, 1351-1352. Section 939.24, Stats. (1989-90), provides:

**Criminal recklessness. (1)** In this section, "criminal reckless-

element, i.e., circumstances which show utter disregard for human life, is intended to codify judicial interpretations of "conduct evincing a depraved mind, regardless of life." State v. Dolan, 44 Wis. 2d 68 (1969); State v. Weso, 60 Wis. 2d 404 (1973).

Judicial Council Committee Note, 1988, sec. 940.02, Stats. The use of the word "reckless" in section 940.02(1), Stats. (1989–90), indicates that "criminal recklessness" is an element of first-degree reckless homicide. *See* sec. 939.24(2), Stats. (1989–90). A person acts with "criminal recklessness" when he or she "creates an unreasonable and substantial risk of death or great bodily harm to another human being and [he or she] is aware of that risk." Section 939.24(1), Stats. (1989–90). "Recklessness requires both the creation of an objectively unreasonable and substantial risk of human death or great bodily harm and the actor's subjective awareness of that risk." Judicial Council Committee Note, 1988, sec. 939.24, Stats. There are thus four ultimate elements to the crime of first-degree reckless homicide:

1. The defendant caused someone's death;

2. By actions that created "an unreasonable and substantial risk of death or great bodily harm";

3. That the defendant was "aware of that risk"; and

ness" means that the actor creates an unreasonable and substantial risk of death or great bodily harm to another human being and the actor is aware of that risk.

**(2)** If criminal recklessness is an element of a crime in chs. 939 to 951, the recklessness is indicated by the term "reckless" or "recklessly."

**(3)** A voluntarily produced intoxicated or drugged condition is not a defense to liability for criminal recklessness if, had the actor not been in that condition, he or she would have been aware of creating an unreasonable and substantial risk of death or great bodily harm to another human being.

4. The circumstances "show[ed] [the defendant's] utter disregard for human life."

Sections 940.02(1), 939.24(1), Stats. (1989–90). The jury here was instructed accordingly, pursuant to Wis J I—Criminal 1020.[4]

Since Blair does not claim the trial court's instructions were improper, our review is limited:

---

[4]The jury was instructed as follows:

Before the Defendant may be found guilty of First Degree Reckless Homicide the State must prove by evidence that satisfies you beyond a reasonable doubt that the following 3 elements of this offense were present:

First, that the Defendant caused the death of Raymond Harris. Second, that the Defendant caused the death by criminal reckless conduct and third, that the circumstances of the Defendant's conduct showed utter disregard for human life.

The first element requires that the relation of cause and affect [sic] exists between the Defendant Raymond Harris [sic] and the conduct of the Defendant. Before the relation of cause and effect can be found to exist, it must appear that the Defendant's conduct was a substantial factor in producing the death.

Second element requires that the Defendant caused the death by criminally reckless conduct. This requires that the defendant's conduct created an unreasonable risk—unreasonable and substantial risk of death or great bodily harm to another person and that the Defendant was aware that his conduct created such risk. The third element requires that the circumstances of the Defendant's conduct showed utter disregard for human life. In determining whether the conduct showed utter disregard for human life, you should consider all the factors relating to the conduct. These include the following: What the Defendant was doing, why he was doing it, how dangerous the conduct was, how obvious the danger was and whether the conduct showed any regard for human life. Now, if you are satisfied beyond a reasonable doubt that the Defendant caused the death of Raymond Harris by criminally reckless conduct, and the circumstances of conduct showed utter disregard for human life, you should find the Defendant guilty of First Degree Reckless Homicide. If you are not so satisfied, you must find the Defendant not guilty.

71

> [A]n appellate court may not substitute its judgment for that of the trier of fact unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. If any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, an appellate court may not overturn a verdict even if it believes that the trier of fact should not have found guilt based on the evidence before it.

*State v. Poellinger,* 153 Wis. 2d 493, 507, 451 N.W.2d 752, 757-758 (1990). Blair argues that the evidence was insufficient to prove him guilty of first-degree reckless homicide. He supports this argument by contentions in his legal submissions that he did not intend to shoot Harris.[5]

**[1]**

Section 940.02(1), Stats. (1989-90), encompasses those homicides where death is not intended as long as the defendant knowingly creates "an unreasonable and substantial risk of death or great bodily harm" to another person (the "criminal recklessness" element from section 939.24(1), Stats. (1989-90)) under circumstances that "show utter disregard for human life." *See State v. Dolan,* 44 Wis. 2d 68, 73, 170 N.W.2d 822, 825

---

[5]As noted, the only eyewitness to testify was Bullock. Blair did not testify, and the contentions in his brief are not evidence. We do not decide, however, whether there is any evidence in the record from which the jury could reasonably infer that Blair intended to shoot Harris. Rather, we assume that the jury concluded that the gun discharged accidently. *See Gross v. Hoffman,* 227 Wis. 296, 300, 277 N.W. 663, 665 (1938) (only dispositive issue need be addressed).

(1969) (The distinction between first-degree murder and second-degree murder prior to the revision of the homicide laws is that the former required there be a "design to effect death" even though both crimes required that there be an intentional act that evinces a "depraved mind regardless of human life."). Blair, however, seizes upon language approved in *Wangerin v. State*, 73 Wis. 2d 427, 434, 243 N.W.2d 448, 451 (1976) (emphasis omitted), to the effect that in order for conduct to evince a depraved mind regardless of human life, the conduct must be "consciously dangerous to life and not such as might casually produce death by misadventure" as supporting his contention that the accidental discharge of the gun removes his actions from the purview of section 940.02(1), Stats. We disagree.

The key word in the phrase approved by *Wangerin* is "casually." As *Wangerin* points out, the central inquiry is whether the actor intended to cause harm. *Id.,* 73 Wis. 2d at 434–435, 243 N.W.2d at 452. Thus, *Wangerin* distinguished *Seidler v. State,* 64 Wis. 2d 456, 219 N.W.2d 320 (1974), where a two-year-old child died after being thrown against a bed's metal frame or bedpost but where there was no evidence that the defendant "consciously threw her at the hard and unyielding portions of the bed," *id.,* 64 Wis. 2d at 463, 219 N.W.2d at 324, *see Wangerin,* 73 Wis. 2d at 434, 243 N.W.2d at 451–452, from *Wangerin* where the defendant consciously beat the deceased, *Wangerin,* 73 Wis. 2d at 435, 243 N.W.2d at 452. Here, in contrast to *Seidler* and akin to *Wangerin,* Blair consciously beat Harris over the head with a loaded pistol. It does not take any special clairvoyance to recognize that using a gun in that way creates a substantial risk of discharge, and the jury could have so found. The jury could have also reasonably found

that Blair was aware of that risk even though, subjectively, he may not have intended for the gun to discharge. *See State v. Davis,* 144 Wis. 2d 852, 855, 863-864, 425 N.W.2d 411, 412-413, 416 (1988) (confronting another person with a loaded gun which accidentally discharged during defendant's struggle with victim shows a "depraved mind" within the purview of section 940.02(1), Stats. (1985-86)). Accordingly, we must affirm. *See Poellinger,* 153 Wis. 2d at 507, 451 N.W.2d at 757-758.

B. *Expert Testimony.* Blair contends that the trial court erred in excluding proffered expert opinions concerning the general reliability of eye-witness testimony. He claims that the evidence was crucial to his case because, other than Bullock, who was originally a suspect in Harris' death, only two persons placed Blair at the crime scene.

A trial court's decision to admit or exclude expert testimony is a discretionary determination that is made pursuant to Rule 901.04(1), Stats.[6] *See also State v. Hamm,* 146 Wis. 2d 130, 142-143, 430 N.W.2d 584, 590 (Ct. App. 1988). The decision will not be upset on appeal if it has "a reasonable basis" and was made " 'in accordance with accepted legal standards and in accordance with the facts of record.' " *State v. Pharr,* 115 Wis. 2d 334, 342, 340 N.W.2d 498, 501 (1983) (citation omitted). A determination of whether a proffered expert witness should be permitted to testify requires an evaluation of whether the testimony will "assist" the jury. *See* Rule

[6]Rule 901.04(1), Stats., provides, as pertinent to this appeal, that "[p]reliminary questions concerning the qualification of a person to be a witness, . . . or the admissibility of evidence shall be determined by the judge . . .."

907.02, Stats.[7] Generally, expert testimony will assist the jury when the issue to be decided requires an analysis that would be difficult for the ordinary person in the community. S. Saltzburg & K. Redden, *Federal Rules of Evidence Manual* 631 (4th ed. 1986) (interpreting Fed. R. Evid. 702, which is identical to its Wisconsin analogue, Rule 907.02). We review the trial court's decision to exclude the proffered expert opinion against this background.

Blair's offer-of-proof before the trial court indicated that he wished to call Ralph Norman Haber, a professor of psychology at the Chicago campus of the University of Illinois with extensive experience in the analysis of human perception. According to Blair's offer, Dr. Haber was not going to give an opinion concerning the reliability of the specific identifications of Blair in this case. Rather, he would have testified as to the following matters:

- "visibility at night . . . that low lighting often equals low confidence and accuracy of eyewitness identifications";

- that "memory has a substantial creative power in affecting [a] witness's recall of that particular memory" and that memory is "easily influenced by thinking it through" so that a "witness who has time to think his recollection through over a period of time changes the reliability of that witness's identification";

---

[7]Rule 907.02, Stats., provides:

**Testimony by experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

- that memory "is affected by the kind of questions asked about the event in question" and that witnesses may recall the interrogator's questions rather than their own observations;

- that a witness' "lack of certainty" increases his or her "vulnerability to [an] interviewer's suggestions";

- that witnesses can "transpose" in their memory a face seen in one context into a different context;

- that in connection with the identification of persons from photographs, "witnesses will tend to pick the picture of the person [that] most closely fits their verbal description";

- that the presence of a weapon detracts from the reliability of an identification;

- that the length of time a witness sees someone affects the witness' ability to identify that person later;

- that "stranger on stranger identification generally has a very low rate of reliability";

- that the most reliable identifications are made by witnesses who are "under moderate amounts of stress," as opposed to extreme or minimal stress.

Blair's counsel argued that although "some of these matters . . . address themselves to common sense," others are "at variance with the common sense or commonly held view of how memory works and I think in how the ordinary juror would view eyewitness identification." The trial court reviewed the offer-of-proof at length, in the context of an article on the subject submitted by Blair (unfortunately, the article is not part of the appellate record), and concluded "that everything that the expert would testify to in essence is within the common

knowledge and sense and perception of the jury" and would overly emphasize a particular school of thought "as to exactly what memory is."[8]

Although reasonable persons might disagree with the trial court's ruling if the analysis were *de novo, cf. Hampton v. State*, 92 Wis. 2d 450, 459, 285 N.W.2d 868, 872 (1979) (trial court permitted psychologist "to inform the jury of the psychological principles underlying human observation and perception, but left to the jury itself the task of applying the principles to the specific facts of [the] case"), the trial court's decision here was within the proper ambit of its discretion: it articulated a reasonable explanation as to why it believed Dr. Haber's

---

[8]The trial court instructed the jury appropriately on the issue of identification as follows:

> Now, the identification of the Defendant is an issue in this case. In evaluating the evidence relating to the identification of the Defendant as a person who committed the alleged crime, you are to consider those factors which might affect human perception and memory. You are to consider all the circumstances relating to the identification. Consider the opportunity the witness who identified the Defendant had to observe the Defendant. How long the observation lasted, how close the witness was to the alleged offender, the lighting, mental state of the witness at the time, physical ability of the witness to see and hear the events and any other circumstances of the observation. With regard to the witness's memory, you should consider the period of time which elapsed between the witness's observation and the identification of the Defendant and any intervening event which may have affected the witness's memory. If you find that the crime alleged was committed before you may find the Defendant guilty, you must be satisfied beyond a reasonable doubt that the Defendant is the person who committed the crime.
>
> It is the theory of the defense in this case that the State has failed to prove beyond a reasonable doubt the identity of the person who shot the victim, Raymond Harris. You may not find the Defendant guilty of this offense unless and until you are satisfied that the State has proven beyond a reasonable doubt the identity of the perpetrator of the offense as that of the Defendant.

77

testimony would not assist the jury. There was no abuse of discretion.[9] Accordingly, we affirm.

*By the Court.*—Judgment affirmed.

---

[9]The writer of this opinion agrees that the trial court did not abuse its discretion in rejecting the proffered expert testimony but believes that the analysis must go further than the panel's decision suggests.

When proffered expert opinion is based on or reflects premises, theories, or hypotheses about which knowledgeable and responsible persons might reasonably differ, that is, "evidence whose scientific fundaments are not suitable candidates for judicial notice," *United States v. Downing,* 753 F.2d 1224, 1237 (3rd Cir. 1985) (expert opinion about eyewitness testimony), the threshold question of whether the expert testimony should be admitted is complex and the trial court's analysis under Rule 907.02, Stats., must be searching. *See Downing,* 753 F.2d at 1226, 1232-1243 (interpreting Fed. R. Evid. 702, which is identical to Rule 907.02); 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 702[03], at 702-37 to 702-44 (1990); *see also United States v. Downing,* 609 F. Supp. 784 (E.D. Pa. 1985) (following remand ordered in 753 F.2d at 1243-1244), *aff'd,* 780 F.2d 1017 (3rd Cir. 1985).

Wisconsin, like *Downing,* has rejected the view, first enunciated in *Frye v. United States,* 293 Fed. 1013, 1014 (D.C. Cir. 1923), that scientific evidence is not admissible unless it is "sufficiently established to have gained general acceptance in the particular field in which it belongs." *See State v. Walstad,* 119 Wis. 2d 483, 515-519, 351 N.W.2d 469, 485-487 (1984); *Downing,* 753 F.2d at 1232-1237. *Walstad's* seeming blanket rule that any "relevant" expert testimony by a "qualified" witness is admissible, 119 Wis. 2d at 518-519, 351 N.W.2d at 486-487, however, has been tacitly limited by the recognition in *State v. Flattum,* 122 Wis. 2d 282, 306, 361 N.W.2d 705, 717-718 (1985), that expert testimony, "[e]ven if relevant," may be excluded following a consideration of the factors in Rule 904.03, Stats., and, *inter alia,* if "it is not

based on scientific knowledge." We are bound by the supreme court's most recent analysis. *Spacesaver Corp. v. DOR,* 140 Wis. 2d 498, 502, 410 N.W.2d 646, 648 (Ct. App. 1987).

*Downing,* 753 F.2d at 1237, identifies the following three broad avenues of appropriate inquiry, which are consistent with the principles recognized in *Flattum:*

1.   *Whether there are proper foundations for the opinion.* This requires a two-step analysis. First, the trial court must determine whether the data upon which the expert has relied are either properly before the jury or, if inadmissible, whether they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject . . .." Rule 907.03, Stats. This latter determination requires fact-finding by the trial court pursuant to Rule 904.01(1), Stats. *See In re Paoli R.R. Yard PCB Litigation,* 916 F.2d 829, 853 (3rd Cir. 1990), *cert. denied,* 111 S. Ct. 1584 (interpreting Fed. R. Evid. 703 and 104(a), which, as pertinent here, are identical to Rules 907.03 and 901.04(1)). Second, the trial court must ascertain whether the data underlying the expert's opinion are valid, and, if so, whether the expert's analysis of that data is also valid. *See* Rule 907.02, Stats; *Hines v. Consolidated Rail Corp.,* 926 F.2d 262, 272 (3rd Cir. 1991) (interpreting Fed. R. Evid. 702); *Paoli,* 916 F.2d at 856–859 (interpreting Fed. R. Evid. 702); *see also Flattum,* 122 Wis. 2d at 306, 361 N.W.2d at 717–718 (psychiatric testimony that "is not based on scientific knowledge" is inadmissible). This is no easy task. As *Paoli* explains: "It can be difficult to determine whether the putative problem with scientific evidence lies in the underlying data itself or the method by which the data is analyzed." *Paoli,* 916 F.2d at 856. Judge Weinstein and Professor Berger have pointed to the following considerations that should be weighed in making these determinations:

> Whether or not the scientific principles involved have been generally accepted by experts in the field may still have a bearing on reliability and consequent probative value of the evidence. The expert's qualifications and stature, the use which has been made of the new technique, the potential rate of error, the existence of specialized literature, and the novelty of the new invention, may all enter into the court's assessment. Opinions which are based in large

> measure on a subjective analysis may have less probative value because it may be difficult to evaluate the skill of the expert in extrapolating a judgment from the scientific data.

3 J. Weinstein & M. Berger, *supra,* at 702-41 to 702-42 (footnotes omitted). Nevertheless, because "[n]on-scientifically trained courts are at a disadvantage in trying to categorize sophisticated scientific data," *Paoli,* 916 F.2d at 856, and because the rules of evidence " 'embody a strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact and for dealing with the risk of error through the adversary process,' " *id.,* 916 F.2d at 857 (citation omitted), the trial court's searching inquiry into the bases for the expert's opinion "must not be used as a tool by which the court excludes all questionably reliable evidence," *ibid; see also Walstad,* 119 Wis. 2d at 518-519, 351 N.W.2d at 487.

2. *Whether the testimony will overwhelm, confuse, or mislead the jury.* This factor requires an inquiry that is similar to the one envisioned by Rule 904.03, Stats., and the trial court must be particularly wary when the proffered expert testimony carries an undeserved aura of " 'mythic infallibility.' " *Downing,* 753 F.2d at 1239 (citation omitted). This is especially true "where the jury is not presented with the data on which the expert relies, but must instead accept the expert's assertions as to the accuracy of his conclusions." *Ibid.* Thus, "a technique that the jury will automatically assume, either because of its notoriety or its elaborate presentation, to be completely reliable, needs to be scrutinized by the court." *Paoli,* 916 F.2d at 856 n.35; *see also Flattum,* 122 Wis. 2d at 306, 361 N.W.2d at 717-718.

3. *Whether and to what extent the evidence is relevant to a disputed fact.* If the evidence is not relevant, that is, if it has no "tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable," the evidence must be excluded. Rules 904.01, 904.02, Stats.; *see also Flattum,* 122 Wis. 2d at 306, 361 N.W.2d at 717.

The trial court's explanation of why it was rejecting Dr. Haber's testimony was consistent with the widely-recognized legal principles discussed in this footnote. Accordingly, I agree

with the majority's determination that there was no abuse of discretion.