COURT OF APPEALS
DECISION
DATED AND FILED

May 23, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1015-CR**

Cir. Ct. No. 2017CF102

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

---

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

ELLEN L. TRAN,

DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Oneida County: PATRICK F. O'MELIA, Judge. *Affirmed.*

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Ellen Tran appeals from a judgment convicting her, following a jury trial, of first-degree reckless homicide. She argues that the

State failed to introduce sufficient evidence at trial to prove each element of that crime. We conclude that there was sufficient evidence before the jury to find Ellen guilty of first-degree reckless homicide and we therefore affirm the judgment of conviction.

## BACKGROUND

¶2 Ellen[1] and her husband, Trung Tran, lived in Rhinelander with their biological daughter Emma and Ellen's biological son, Aaron. Trung also had a child, Austin, from a relationship with a woman named Lauren.

¶3 In March 2016, a visitation schedule was established under which Austin would visit Trung and Ellen for seven days every month. There was no issue with Austin's first visit in May 2016 when Austin was seven months old.

¶4 The second visit took place between July and August 2016. This time, there were a number of issues concerning Austin, including Ellen feeding Austin her breastmilk and Ellen taking Austin to North Carolina without Trung for the entirety of the scheduled visit. After picking Austin up from Ellen, Lauren observed bruising and scratches on Austin's body. Ultimately, Lauren took Austin to a hospital, contacted social services, and filed a protective order against Ellen. A court dismissed the order against Ellen in February 2017.

---

[1] This case involves multiple individuals with the same surname. Following the parties' lead on appeal, we address those individuals by their first names.

Pursuant to the policy underlying WIS. STAT. RULE 809.86 (2021-22), we use pseudonyms when referring to the victim and the victim's biological mother. Similarly, we use pseudonyms when referring to any minors. All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

¶5      After the protective order was dismissed, the visitation order was modified, allowing Trung more time with Austin.  The third visit, ultimately Austin's last, began on March 31, 2017, and was set to last thirty days.

¶6      On April 14, 2017, at around 6:25 p.m., the Oneida County Sherriff's Office was informed by dispatch that Ellen had called 911 stating that she had just gotten Austin out of the shower, that "something was wrong with" him, and that he was not breathing properly.  Austin was transported by EMS to Ministry Saint Mary's Hospital in Rhinelander and was eventually flown to Ministry Saint Joseph's Hospital in Marshfield.  Austin died that night at around 11:30 p.m.  A medical examiner performed an autopsy, concluding that Austin died of blunt force trauma to the head.

¶7      Ellen was charged with one count of first-degree reckless homicide.  The case proceeded to a jury trial.  Following four days of testimony, the jury found Ellen guilty of first-degree reckless homicide.  Ellen appeals.  Additional facts will be included below as necessary.

## DISCUSSION

¶8      Whether evidence at trial is sufficient to sustain a guilty verdict in a criminal prosecution is a question of law we review de novo.  *State v. Smith*, 2012 WI 91, ¶24, 342 Wis. 2d 710, 817 N.W.2d 410.  We will not, however, substitute our judgment for that of the jury unless

> the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt.  If any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, an appellate court may not overturn a verdict even if

> it believes that the trier of fact should not have found guilt based on the evidence before it.

***State v. Poellinger***, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990) (citation omitted). The standard of review in circumstantial evidence cases is the same:

> In reviewing the sufficiency of circumstantial evidence to support a conviction, an appellate court need not concern itself in any way with evidence which might support other theories of the crime. An appellate court need only decide whether the theory of guilt accepted by the trier of fact is supported by sufficient evidence to sustain the verdict rendered.

*Id.* at 507-08.

¶9 The jury found Ellen guilty of first-degree reckless homicide, a violation of WIS. STAT. § 940.02(1). Under § 940.02(1), the State bore the burden of proving beyond a reasonable doubt that: (1) Ellen caused the death of Austin; (2) Ellen caused his death by criminally reckless conduct; and (3) the circumstances of Ellen's conduct showed utter disregard for human life. *See* WIS JI—CRIMINAL 1020 (2015). Ellen challenges the sufficiency of the evidence for each of these three elements on appeal.

¶10 At trial, the State presented recorded statements Ellen made to law enforcement following Austin's death, which were admitted into evidence. Notably, the statements reflect that Ellen initially told Oneida County Sheriff's Office Detective Chad Wanta, who was the first detective to respond to the scene of the incident, that she "put [Austin] in the shower … and [she] showered him off." She added that Austin "was fine the whole time." Later during the interview, after a phone call with Trung, Ellen told Wanta that "[t]hey said he had [a] subdural hematoma" and that she "guess[ed]" he hit his head in the shower.

4

Wanta inquired further, and Ellen confirmed that Austin "did slip up and hit his head" in the shower.

¶11     Ellen's version of events, however, did not comport with testimony from the State's experts.  At trial, Dr. Doug Kelley, the medical examiner who performed Austin's autopsy, testified that it was his conclusion that Austin's cause of death was blunt force trauma to the head.  Specifically, Kelley determined that Austin's head injuries included: an acute subdural hemorrhage; an acute subarachnoid hemorrhage; brain swelling; traumatic and hypoxic axonal injuries; and bilateral retinal and optic nerve hemorrhages.

¶12     According to Dr. Kelley, his findings relating to Austin's external and internal injuries were consistent with injuries caused by the impact of Austin's head with a surface.  Kelley noted that Austin had extensive bruising to his head. He stated that head injuries can be divided into two groups: focal injuries and diffuse injuries.  The former "are the kind of injuries that you get from falling and hitting your head, and they result in things like skull fractures and localized subdural hematomas."  Diffuse injuries, on the other hand, are "different than falling and just hitting your head on the wall or something like that or bumping your head during a simple fall."  According to Kelley, the "more severe force involved," the deeper the axon damage becomes and "you start getting down to areas that affect very vital functions like breathing."  Kelley testified that Austin suffered a diffuse axonal brain injury, not a focal injury.

¶13     Doctor Kristen C. Iniguez, a pediatrician at Ministry Saint Joseph's Hospital who specializes in child abuse medicine and who inspected Austin's body following his death, also testified as to Austin's injuries.  In addition to extensive bruising on Austin's body—essentially from the shoulders down—

Austin also had a "large" bruise on the right side of his forehead and two bruises on the left side of his forehead. Iniguez concluded that Austin's injuries were consistent with nonaccidental trauma and abusive head trauma. A number of photographs depicting Austin's external injuries were offered by the State and admitted into evidence.

¶14    Doctor Lynn P. Gehrmann, an emergency physician at Ministry Saint Mary's Hospital who treated Austin prior to his death, testified that a scan of Austin's brain "showed a very small" subdural hematoma, which meant the "bleeding amount … was not that much."[2] Furthermore, Austin was hypothermic and had low blood pressure. Gehrmann stated that the diffuse axonal brain injury explained Austin's hypothermia and low blood pressure.

¶15    As part of its theory that Ellen killed Austin, the State also presented evidence regarding Ellen's relationship with Austin and his biological mother, Lauren. For example, the State presented testimony that during the July-August 2016 visitation, Ellen was caring for Austin by herself in North Carolina while Trung was in Rhinelander. According to Lauren, upon picking up Austin from Ellen's care, she noticed scratches and bruises on Austin's body. Later that day, Austin began "screaming" in his sleep, and it took Lauren ten to

---

[2] At trial, the defense presented Austin's brain scans via a flash drive, which were admitted into evidence. On appeal, we are unable to access any images on the flash drive. We find this inability immaterial to our review, however, because there was no dispute at trial as to what the scans showed. For example, all three of the doctors who testified about the scans agreed that Austin had a small subdural hematoma but that the hematoma, by itself, did not cause Austin's death. The defense's expert witness was "skeptical" about Dr. Kelley's diffuse axonal brain injury diagnosis. That diagnosis, however, did not originate from the scans but from looking "at the tissues under [a] microscope using a special stain which identifies damaged nerve cells." Therefore, the scans would not have been useful for purposes of a sufficiency of the evidence analysis.

twenty minutes to wake him. As a result, Lauren took photographs of Austin's injuries, which were admitted at trial and depicted the scratching and bruising. Lauren testified that she also took Austin to a doctor, who instructed her take him to a hospital. Testimony was also elicited regarding the protective order against Ellen.

¶16 Just prior to Austin's last visit with Ellen and Trung, Lauren took photographs of Austin, which were presented to the jury. The photographs depicted Austin without "any marks or anything on his body." The State also offered two photographs of Austin taken shortly after the fatal incident by Oneida County Sheriff's Office Captain Terri Hook, which were admitted into evidence. The photographs depicted extensive bruising to Austin's body. In a second recorded interview on the night of the incident, which was played for the jury and admitted into evidence, Hook asked Ellen about the photographs that Hook took of Austin. Ellen responded that the bruise on Austin's hip might have been from "a diaper [being] on too tight."

¶17 The State also presented text messages between Ellen and Trung that were admitted into evidence. For example, the circuit court admitted texts between Ellen and Trung from late May 2016—shortly after Austin's first visit—in which Ellen expressed her displeasure with Lauren and the fact that Trung was ordered to pay her child support. In one text, Ellen states: "She's not got full control and your money bitch will suffer." In the next text, Ellen states, "I will promise u that." Later, Ellen texted Trung: "We can't miss out [on] visitation with him tho as much as we hate it the best way to get []at her is by taking [Austin] away …." Texts between Ellen and Trung from June 2016 were also admitted, in which Ellen wrote:

7

> Your son is a brat and not only that but it[']s an embarrassment to me that my husband has a kid so close to the age of our daughter. It makes me look so stupid bc everyone thinks you are some man whore adulterer. But I stuck by trying to bear the thought of living my life in such shame.

Ellen also texted Trung in November 2016, writing:

> I wish your illegitimate love child was never born now … I'm stuck dealing with him.
>
>  ….
>
> I hate dealing with him and your bitch x.
>
>  ….
>
> I hate your lil bitch son I wish u weren't stupid enough to knock up a fucking bitch.
>
>  ….
>
> I love my son. Yours is a dumb bastard. I wish he had of died. Your lil bitch x fucking shit up.
>
>  ….
>
> I wish u would get rid of this stupid bastard kid of yours.

¶18    Oneida County Sheriff's Office Sergeant Kelly Moermond testified that shortly after she arrived at the scene of the incident, Ellen "said that [Austin] was an unhappy child, and at one point she said that he was a pitiful child and all he did was cry and that he was way different than" her daughter Emma. The State theorized during its closing argument: "Is that the underlying theme? If [Austin's] out of the picture, get this happy family, her biological son [Aaron], her biological daughter [Emma] with Trung. [Austin's] the outcast. He's not the biological son. He's different and he's treated differently."

8

¶19     The defense provided alternative theories as to how Austin died. For example, the defense offered evidence that Trung killed Austin by giving him a lethal dose of drugs. In support of this theory, the defense pointed to admitted evidence found throughout the residence, including a syringe containing an unknown liquid that was found in the kitchen. The defense also pointed to the presence of pseudoephedrine found in Austin's blood. Doctor Joseph Scheller, the defense's expert witness, concluded that Austin could have died from toxic exposure to the drug. Notably, the defense presented a signed affidavit by Hook that was used to obtain a search warrant for Ellen and Trung's house shortly after Austin's death. Hook stated in the affidavit, which was admitted into evidence, that she had received an email from Dr. Iniguez on April 20, 2017, stating that Austin had "received a lethal dose of pseudoephedrine."

¶20     On cross-examination, however, Hook stated that Dr. Iniguez's preliminary information turned out to be incorrect. Furthermore, Dr. Kelley disagreed that the amount of pseudoephedrine found in Austin's system could be lethal, stating that the levels were "nowhere near" what literature says would cause a child's death. Additionally, Dr. Gehrmann explained to the jury that her team conducted a urine drug screen, which tests "for any sort of illicit drugs." According to Gehrmann, pseudoephedrine was not present in the screening, which meant that the drug did not have a certain concentration in Austin's system to meet the test's threshold level for detection.

¶21     The defense also tried to refute the State's evidence that Austin died from a diffuse axonal brain injury and instead asserted that he could have died as the result of seizures. Doctor Scheller opined that Austin died as a result of seizures caused by the subdural hematoma, which led to an acute subarachnoid hemorrhage (bleeding underneath the dura layer of the brain). Scheller also

9

explained that he was skeptical of the conclusion that Austin suffered from a diffuse axonal brain injury. However, he admitted on cross-examination that there were no signs or symptoms of a seizure, and Dr. Kelley testified that he disagreed with Scheller's conclusion that Austin died as a result of seizures.

¶22    Another theory of defense was that Austin could have died from an unknown, previously inflicted brain injury. Doctor Kelley, however, testified that "[t]he extent of [Austin's] diffuse injury would suggest … he was [acting] different, if not completely unconscious, from the moment that [the] injury was incurred." Aaron (Ellen's child and Trung's stepchild) testified that he was in the bedroom connected to the bathroom where Ellen and Austin were showering. He stated that Austin was fine prior to entering the shower and when Ellen was changing him, "but then all of a sudden he just started acting kind of weird." Aaron also testified that Trung did not hurt Austin in any way prior to leaving for work.

¶23    When the evidence is viewed in a light most favorable to the conviction, we conclude that a reasonable jury could have found Ellen guilty of first-degree reckless homicide. As to the first element of that crime, there was sufficient evidence presented for the jury to find that Ellen caused Austin's death. "Cause" means that the defendant's act was a substantial factor in producing the death. *See* WIS JI—CRIMINAL 1020 (2015). The State conceded that it could not point to exactly what happened leading up to Austin's injuries, but it argued that Ellen did *something* in the shower to cause Austin's death. During its closing argument, the State argued, "Is she holding him by the legs? I don't know. Did she hold him by the arms, throw him against the wall in the bathroom? I don't know. But all those [injuries], they're consistent with something like that."

¶24    The evidence was sufficient for the jury to find that Austin died due to blunt force trauma to the head caused by Ellen. The State presented evidence that Austin died due to a severe force not attributable to a fall in the shower. Additionally, it was uncontroverted that Austin was not exhibiting signs of a brain injury prior to Trung leaving for work and prior to Austin entering the shower. Furthermore, Dr. Kelley testified that the injuries Austin sustained meant that Austin would have been affected immediately. If believed, Kelley's testimony debunked the defense's theory that Austin's head injury could have happened prior to Ellen being alone with Austin that day or that the injury may have occurred days before Austin's symptoms arose. *See **Poellinger***, 153 Wis. 2d at 504 ("The credibility of the witnesses and the weight of the evidence is for the trier of fact." (citation omitted)).

¶25    The jury was therefore presented with evidence that Austin suffered a traumatic brain injury in the shower, which caused his death, and that the injury occurred while he was alone with Ellen, who had previously expressed extreme displeasure with Austin and his biological mother. Further, Ellen's evolving story supports the jury's decision, as it indicates that Ellen's version of events was incredible. Although circumstantial, the evidence supports a finding that Ellen's conduct—whether that be pushing Austin into something or throwing him against the shower walls—was a substantial factor in producing Austin's death. The State therefore, presented sufficient evidence to prove the first element of first-degree reckless homicide.

¶26    Ellen argues on appeal that her "being present when [Austin] fell is not evidence that Ellen caused [him] to fall. Nor is it evidence that the fall caused [Austin's] death." As explained, however, the State did not argue that Austin's

death was caused by a fall. In fact, the State argued in its closing argument that the testimony at trial demonstrated a fall could not have caused Austin's death.

¶27 As to the second element of first-degree reckless homicide, there was sufficient evidence presented for the jury to find that Ellen caused Austin's death by criminally reckless conduct. As the circuit court instructed the jury, "criminally reckless conduct" means: (1) the conduct created a risk of death or great bodily harm to another person; (2) the risk of death or great bodily harm was unreasonable and substantial; and (3) Ellen was aware that her conduct created the unreasonable and substantial risk of death or great bodily harm. *See* WIS JI—CRIMINAL 1020 (2015).

¶28 Relying on the evidence outlined above, the jury could find that Ellen's conduct created an unreasonable and substantial risk of death or great bodily injury. The jury clearly believed that Ellen caused Austin's death. The jury could have further reasonably found that Ellen knew that her actions created an unreasonable and substantial risk of Austin's death or great bodily harm. Under the evidence presented, the jury could find that Ellen's conduct was violent and reckless, and she was aware of the risks associated with her actions in the shower. A reasonable jury could find that Ellen acted violently in a rage over Austin's crying, the circumstances of his birth, and his purported infringement into her life. The evidence, although circumstantial, supports a finding that Ellen caused Austin's death by criminally reckless conduct.

¶29 On this element, Ellen argues that the State's theory is "reminiscent of the doctrine of *res ips[a] loquitur*." *See **Lambrecht v. Estate of Kaczmarczyk**, 2001 WI 25, ¶33, 241 Wis. 2d 804, 623 N.W.2d 751 ("Res ipsa loquitur is a rule of circumstantial evidence that permits a fact-finder to infer a defendant's

negligence from the mere occurrence of the event."). Aside from arguing that she is "unaware of any Wisconsin cases holding that a *res ips[a] loquitor* inference can support a finding of criminal recklessness beyond a reasonable doubt," Ellen does not make any effort to explain how a civil negligence doctrine applies to this criminal case. Importantly, Ellen does not explain how the State's theory in this case relied on res ipsa loquitur and not the facts available to the jury. *See* **Poellinger**, 153 Wis. 2d at 504 (reasonable inferences can support a finding of fact). We deem Ellen's argument in this regard to be undeveloped and will not address it further. *See* **State v. Pettit**, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992). Even if we were to address Ellen's res ipsa loquitur argument, from what we can discern, she appears again to be arguing that she cannot be criminally liable if she were merely present when Austin fell and was injured. However, for reasons we explained, this argument fails. *See supra* ¶26.

¶30 Regarding the third element, there was sufficient evidence for the jury to find that the circumstances of Ellen's conduct showed utter disregard for human life. Whether a defendant had utter disregard for human life is an objective inquiry, based on "what a reasonable person in the defendant's position would have known." **State v. Johnson**, 2021 WI 61, ¶29, 397 Wis. 2d 633, 961 N.W.2d 18 (citation omitted). A defendant "acting with utter disregard must possess 'a state of mind which has no regard for the moral or social duties of a human being.'" **Id.** (citation omitted). Consistent with the pattern jury instruction, the circuit court instructed the jury:

> In determining whether the circumstances of the conduct showed utter disregard for human life, consider these factors: what the defendant was doing; why the defendant was engaged in that conduct; how dangerous the conduct was; how obvious the danger was; whether the conduct showed any regard for life; and, all other facts and circumstances relating to the conduct.

> Consider also the defendant's conduct after the death to the extent that it helps you decide whether or not the circumstances showed utter disregard for human life at the time the death occurred.

*See* WIS JI—CRIMINAL 1020 (2015).

¶31    Again, the evidence showed that something happened to Austin in the shower that was not merely an accident.  Consistent with the State's medical witnesses' testimony, that "something" was not Austin falling over and hitting his head.  Instead, the evidence showed that Ellen used enough force to cause Austin's diffuse axonal brain injury.   The cause of Austin's injury was, as the State explained, "consistent with" Ellen "holding him by the legs" or "hold[ing] him by the arms" and "throw[ing] him against the wall in the bathroom."  Given those facts, the jury could reasonably conclude that Ellen's conduct was clearly dangerous and its outcome obvious:  that Austin would be severely harmed or die.  There was sufficient evidence for the jury to find that Ellen acted with utter disregard for Austin's life.

¶32    Ellen attempts to compare this case to *Seidler v. State*, 64 Wis. 2d 456, 461, 219 N.W.2d 320 (1974), where our supreme court concluded that there was insufficient evidence to find guilt for second-degree murder.[3]  In *Seidler*, the defendant, a babysitter, became "mad" at a child after the child had a "bowel accident."  *Id.* at 458.  The babysitter took the child's arm and threw her into a

---

[3] *Seidler v. State*, 64 Wis. 2d 456, 463-66, 219 N.W.2d 320 (1974), analyzed whether the evidence was sufficient to support a second-degree murder conviction and, as relevant to this case, the "depraved mind" element of that offense.  Our supreme court has since explained that the "depraved mind" element at issue in *Seidler* is analogous to the "utter disregard" element of first-degree reckless homicide.  *See State v. Jensen*, 2000 WI 84, ¶¶18, 27, 236 Wis. 2d 521, 613 N.W.2d 170.

14

bedroom, causing the child to hit the bottom of a bunk bed. *Id.* Ultimately, the child died from internal bleeding. *Id.* at 459. The court concluded that the babysitter's conduct was not imminently dangerous and did not evidence a depraved mind, citing the distance between the door and the bed, and the fact that the babysitter did not intentionally throw the child toward the metal part of the bed. *See id.* at 463-66; *see also* **State v. Jensen**, 2000 WI 84, ¶¶26-28, 236 Wis. 2d 521, 613 N.W.2d 170 (discussing **Seidler** in a case involving the sufficiency of the evidence to support a conviction for first-degree reckless injury).

¶33    According to Ellen, "the determination of the criminal act was critical to the court's conclusion" in **Seidler** that there was insufficient evidence. She argues that there was no evidence presented to the jury to identify the nature of her conduct toward Austin.

¶34    We disagree for the reasons already explained. Again, there was evidence that Ellen engaged in some nonaccidental conduct and caused significant injury to Austin's brain that went above and beyond what would have occurred due to a simple fall in the shower. That fact, taken together with the remaining circumstantial evidence (e.g., the State's evidence regarding Ellen's motive; the fact that Austin was not exhibiting signs of a brain injury prior to Trung leaving for work; and Ellen's evolving story), provided the jury with enough evidence to find that Ellen acted with utter disregard for human life.

¶35    Many of Ellen's remaining arguments on appeal are directed at what she claims are missing pieces of evidence in the State's case. For example, she argues that the State failed to explain how Austin could suffer a diffuse axonal brain injury without the injury also resulting in a skull fracture; that Aaron testified that Austin was acting "normal" immediately after the shower; that the

State failed to explain how this case is different from other slip-and-fall incidents among children, which are statistically common; and that the State could not explain when the bruising on Austin's body occurred.

¶36    In making these arguments, Ellen ignores the standard of review we apply to sufficiency of the evidence challenges.  We do not substitute our judgment for that of the jury as long as there is "any possibility" that the jury "could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt."  *See **Poellinger***, 153 Wis. 2d at 507 (citation omitted).  As explained in detail above, the State presented sufficient evidence as to each element of first-degree reckless homicide for the jury to make such a finding of guilt.  We therefore affirm Ellen's judgment of conviction.

*By the Court.*—Judgment affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.