Sᴛᴀᴛᴇ of Wisconsin, Plaintiff-Respondent,

v.

Forest S. Sʜᴏᴍʙᴇʀɢ,
Defendant-Appellant-Petitioner.†

Supreme Court

*No. 2004AP630–CR. Oral argument September 30, 2005.
—Decided January 31, 2006.*

2006 WI 9

(Also reported in 709 N.W.2d 370.)

† Motion for reconsideration denied 6-30-06.

1

[redacted]

2

4

For the defendant-appellant-petitioner there were briefs by *Charles W. Giesen* and *Giesen Law Offices, S.C.,* Madison, and *Morris D. Berman* and *Berman Law Office,* Madison, and oral argument by *Charles W. Giesen.*

For the plaintiff-respondent the cause was argued by *Christopher G. Wren,* assistant attorney general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

An amicus curiae brief was filed by *Keith A. Findley, John A. Pray,* and *Byron C. Lichstein,* Madison, on

behalf of the Wisconsin Innocence Project of the Frank J. Remington Center, University of Wisconsin Law School.

¶ 1. N. PATRICK CROOKS, J. This is a review of an unpublished decision of the court of appeals. Petitioner Forest S. Shomberg (Shomberg) appeals the decision of the court of appeals upholding the judgment and order of the circuit court. We address three main issues on appeal. First, we must examine whether the circuit court erroneously exercised its discretion in refusing to allow Shomberg to present expert testimony on eyewitness identification. Second, we are asked to determine whether the circuit court's exclusion of the expert testimony violated Shomberg's constitutional right to present a defense. Finally, this court must resolve whether the circuit court erred in refusing to allow in evidence the fact that Shomberg had offered to take a polygraph examination. Shomberg asks this court to reverse the decision of the court of appeals and remand his case to the circuit court for a new trial in the interest of justice.

¶ 2. We conclude that the circuit court did not, at the time of its decision in 2002, erroneously exercise its discretion in excluding the expert testimony on eyewitness identification proffered by Shomberg. We also determine that even if the circuit court did commit error, any such error was harmless. Further, we hold that the absence of expert testimony on eyewitness identification did not deprive Shomberg of his constitutional right to present a defense. In addition, we determine that Shomberg should not be granted a new trial in the interest of justice, as the real controversy in this case has been fully tried. Finally, we conclude that the offer to take a polygraph was properly excluded, because there was insufficient evidence in the record to

find either that Shomberg had initiated the offer to take a polygraph examination, or that he believed the results of the test were admissible.

I

¶ 3. The relevant facts are not in dispute. S.B., a University of Wisconsin undergraduate, was walking home from a party at approximately 2:45 on the morning of March 9, 2002, when she heard footsteps behind her. When she turned to see who was there, she saw the face of a male approximately 12 inches behind her. When S.B. turned away from him to flee, the assailant grabbed her from behind, placing both hands over her mouth. With his hands still over her mouth, he lifted S.B. off the ground, and carried her into an alleyway adjacent to the Frances Street parking ramp near the University of Wisconsin campus. He forced S.B. to her knees with the weight of his body. She managed to pry his hands off her mouth, and she screamed for help. The assailant again covered her mouth with his hands, then, with his right hand, reached under her skirt and grabbed her vaginal area through her pantyhose and panties. S.B. was able to pry his left hand loose and scream again for help.

¶ 4. Alan Ferguson (Ferguson), a private security guard, was in his patrol vehicle at the Frances Street parking ramp working on his shift report when he heard S.B.'s screams. He got out of the car, and followed the sounds down to the alleyway adjacent to the parking ramp. When Ferguson reached the alleyway, he saw a man on the ground on his knees and what appeared to be a person beneath the man. Ferguson then switched his radio to the main dispatch channel, which caused his radio to beep. The assailant turned and looked at Ferguson, got up from the ground and ran away toward an apartment building. Ferguson ran after the man.

7

Ferguson testified at trial that, during the chase, the man slipped on some snow, looked over his shoulder in Ferguson's direction and then continued to flee. Ferguson did not apprehend the man he had chased.

¶ 5. S.B. described her assailant as being 20 or 30 years old, about 5'10" tall, lean, athletic build, with blue eyes. She indicated he had no facial hair and no glasses. She could not recall anything about his hair, but at cross-examination she indicated she knew he was wearing long pants and a long-sleeved shirt. S.B. did not notice any tattoos on her assailant's hands, nor deformities to his fingers.

¶ 6. Ferguson described the assailant in his incident report as a white male in his mid 20's, who was 5'8" to 5' 10" tall (and to police as 5'8"), with a muscular build and a shaved head. Ferguson said the assailant had no facial hair or glasses, and that he saw no scars on his face or head, nor any tattoos on his body. He described the man as wearing a gray, long-sleeved shirt, possibly a sweatshirt, and blue jeans or dark-colored trousers.

¶ 7. On April 4, 2002, S.B. and Ferguson each attended a lineup. S.B. was told that she would see a lineup that may or may not include the man they arrested for assaulting her. All of the individuals in the lineup were wearing jail outfits. Both S.B. and Ferguson independently identified suspect number five on their individual Witness Line-Up Identification Forms. Shomberg was suspect number five, although he was the second person to enter the room.

¶ 8. Shomberg waived his right to a jury trial and a trial to the court, Judge Patrick J. Fiedler, took place on April 8 and 9, 2003. Shomberg was found guilty of second-degree sexual assault, false imprisonment, and two counts of bail jumping, all as a habitual offender pursuant to Wis. Stat. §§ 940.225(2)(a), 940.30, and

946.49(1)(b) (2003–04).[1] He was sentenced to one 20–year term, with an initial confinement of 12 years, and two 10–year sentences, each to run concurrently. On November 14, 2003, Shomberg filed a motion for a new trial and sentencing memorandum. A hearing was held on the motion for a new trial on February 2, 2004. The motion was denied on that same day.

¶ 9. Shomberg filed a notice of appeal in the circuit court on February 25, 2004. The court of appeals filed an unpublished decision on December 23, 2004, affirming the judgment of the circuit court and denying Shomberg's post-conviction motion. This court granted review on March 8, 2005.

## II

¶ 10. "The admissibility of expert opinion testimony lies in the discretion of the circuit court." *State v. St. George,* 2002 WI 50, ¶ 37, 252 Wis. 2d 499, 643 N.W.2d 777 (*citing Martindale v. Ripp,* 2001 WI 113, ¶ 28, 246 Wis. 2d 67, 629 N.W.2d 698; *State v. Watson,* 227 Wis. 2d 167, 186, 595 N.W.2d 403 (1999)). "We review a circuit court's decision to admit or exclude evidence under an erroneous exercise of discretion standard." *Martindale,* 246 Wis. 2d 67, 28 (citations omitted). We apply the erroneous exercise of discretion standard to both evidentiary issues in this case.

¶ 11. The inquiry into a circuit court's exercise of "discretion in making an evidentiary ruling is highly deferential. . . ." *Id.,* ¶ 29. As we have previously stated:

---

[1] All subsequent references to the Wisconsin Statutes are to the 2003–04 version unless otherwise indicated.

> The question on appeal is not whether this court, ruling initially on the admissibility of the evidence, would have permitted it to come in, but whether the trial court exercised its discretion in accordance with accepted legal standards and in accordance with the facts of record. The test is not whether this court agrees with the ruling of the trial court, but whether appropriate discretion was in fact exercised.

*Id.* (citations omitted).

"We will not find an erroneous exercise of discretion if there is a rational basis for a circuit court's decision." *Id.* (citations omitted).

¶ 12. Wisconsin Stat. § 907.02 provides "[I]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Wis. Stat. § 907.02.

¶ 13. The circuit court denied Shomberg's request to allow expert testimony on the factors that may influence a witness's ability to identify a stranger, including the relative reliability of sequential versus simultaneous lineups, relative judgment, transference, the absence of a reliable relationship between confidence of the witness and the accuracy of the identification, and examples of people wrongly convicted of crimes based solely on an incorrect identification. The circuit court felt that " 'everything that the expert would testify to in essence is within the common knowledge and sense and perception of the jury.' " *State v. Blair,* 164 Wis. 2d 64, 76–77, 473 N.W.2d 566 (1991) (footnote omitted).

¶ 14. Counsel for Shomberg was unable to articulate satisfactorily for the circuit court the basis upon which the factors influencing the reliability of eyewitness identifications would assist the trier of fact. The factors that Shomberg's lawyer offered were, in the court's estimation, ones that could be adequately explored by cross-examining a testifying witness, and in opening statements and closing arguments.

> THE COURT: It sounds like the factors involved here, how much light was available, how long did the person have to view the individual, how close was the individual, was there anything that obstructed the individual's face, had the person who is making the identification been drinking or taking drugs, et cetera, these are all matters of perception within the realm of lay people, aren't they?

> MR. COHEN (COUNSEL FOR SHOMBERG): What about the area that a person viewing six people tends to use relative judgment? Natural inclination to say to pick somebody out, it must be the person, rather than there's a reason for – –

> THE COURT: Do you have anything beyond that?

> MR. COHEN: No.

> THE COURT: So what we're back to is, you want to call this individual who will opine that sequential lineups are better than simultaneous lineups?

> MR. COHEN: And the reason why, not just that they're better, but here's why. Here's the problems with simultaneous ones.

> THE COURT: Because, in part, it's a process of elimination as opposed to positive identification.

11

MR. COHEN: The fact that exactly, at least part of what the victim said, when she put down her answer, "Well, I knew it wasn't one and three because they were too big. I knew it wasn't two and four because they were too old."

THE COURT: But isn't that something that you would also ask the witness on cross-examination?

MR. COHEN: I sure could. I sure could, but it's a process that, I think it's important. What I was impressed with was the experiments that they have done. That really sort of, you know, sewed it up for me. This was really a much better way of doing it.

THE COURT: Well, are you seeking to elicit his opinion that there have been a hundred cases in which identification testimony secured a conviction, later found to be faulty, due to subsequent DNA testing?

MR. COHEN: No.

THE COURT: So what we're back to is his opinion that sequential is better than simultaneous.

MR. COHEN: And why.

THE COURT: Because simultaneous means the person, the witness, in essence, has the burden of making a positive identification as opposed to simply eliminating people that the witness does not feel were the perpetrator with the, I guess implicit within the witness's belief, that one of these people must be the perpetrator.

MR. COHEN: Yes. Relative judgment.

THE COURT: Anything else?

MR. COHEN: No.

¶ 15. In 2002, at the time of the circuit court's decision to exclude testimony from Shomberg's expert, New Jersey was the only state to mandate sequential rather than simultaneous lineup procedures. In the intervening years, much has been learned about the processes and limitations of memory. There has been a wealth of information that has come to the public that has increased awareness of some of the inherent difficulties with eyewitness identification.[2]

¶ 16. In *State v. Dubose,* this court recognized that "[t]he research strongly supports the conclusion that eyewitness misidentification is now the single greatest source of wrongful convictions in the United States, and responsible for more wrongful convictions than all other causes combined." *State v. Dubose,* 2005 WI 126, ¶ 30, 285 Wis. 2d 143, 699 N.W.2d 582. Indeed, just this year the Wisconsin Department of Justice published recommended guidelines for law enforcement on eyewitness identification, including a Model Policy and Procedure for Eyewitness Identification and a Comprehensive Review & Analysis of Best Practices.[3] In a similar vein, a legislative task force was created in December 2003 to examine cases of wrongful convictions, and develop recommendations on ways to improve the criminal justice system.[4] Indeed, just this year, the Criminal Justice Reform Act was signed into law implementing many of the recommendations of the

[2] For a non-exhaustive list of some of the more recent studies examining identification evidence, see *State v. Dubose,* 2005 WI 126, ¶ 29, 285 Wis. 2d 143, 699 N.W.2d 582.

[3] Available at: http://www.doj.state.wi.us/news/nr030905_ PL.asp.

[4] Available at: http://www.law.wisc.edu/fjr/innocence/eyewitness_guidelines.htm.

task force regarding, among other things, eyewitness identification reform.[5]

¶ 17. Were this case to come before the circuit court today, given the developments that have occurred in the interim, it is highly likely that the judge would have allowed the expert to testify on factors that influence identification and memory. However, the issue before us is not what we would have done, or what a court might do today. The issue is whether, at the time of the decision, the bases upon which the circuit court decided to exclude Shomberg's expert testimony constituted an erroneous exercise of discretion. The court clearly felt that the limitations of eyewitness identification, as articulated by counsel for Shomberg, were known and understood by the court.[6] Neither counsel's written motion nor oral advocacy at the motion hearing was sufficient to satisfy the court that Shomberg's eyewitness expert would assist the trier of fact "to determine a fact in issue," especially since the arguments were known and understood by the court.[7] Wis.

---

[5] 2005 Wisconsin Act 60. Although the new act became effective December 31, 2005, the provision requiring law enforcement agencies to adopt written policies for eyewitness identification procedures will take effect on December 1, 2006.

[6] Since Justice Butler's dissent spends time discussing jurors and jury instructions (Justice Butler's dissent, ¶ 72), it must again be noted that this case was tried to the court, without a jury. Judge Fiedler was informed, before he made his ruling on the admissibility of the expert testimony, that Shomberg would be waiving his right to a jury trial. In fact, that waiver occurred immediately after the circuit court's ruling on the admissibility issue.

[7] Contrary to Chief Justice Abrahamson's dissent, we do not seek to justify the circuit court's exclusion of Shomberg's expert witness "on the ground that the expert witness would offer a

Stat. § 907.02. We conclude that the " 'court exercised its discretion in accordance with accepted legal standards and in accordance with the facts of the record,' " and therefore it was not an erroneous exercise of discretion for the circuit court to deny Shomberg's motion to admit expert eyewitness testimony. *Martindale,* 246 Wis. 2d 67, ¶ 29 (citations omitted).[8]

## III

¶ 18. This court has found that there was no erroneous exercise of discretion by the circuit court.

---

relatively new explanation of the weakness of simultaneous lineups." Chief Justice Abrahamson's dissent, ¶ 53. As we have previously noted, Judge Fiedler had read and was familiar with the contents of the expert's report. Because he knew the case would be tried to the bench, the judge made repeated attempts to evoke a response from defense counsel that would tell him what the expert would testify to that he had not already gleaned from that report. The testimony was excluded because the court determined Shomberg's expert would not assist the trier of fact.

[8] Justice Butler's dissent is wrong when it states that "the decision of the trial court to exclude the expert testimony regarding the factors surrounding eyewitness identification was clearly erroneous." Justice Butler's dissent, ¶ 74. Justice Butler's dissent is also wrong when it concludes that "the proffered expert testimony in this case is relevant, because the proffered expert testimony would assist the trier of fact. . . ." *Id.* The circuit court concluded that the proposed testimony would not assist the trier of fact. In addition, the court focused on specific portions of the proposed testimony, and found they were not relevant. At the time of the motion hearing, the circuit court had in front of it the report of the expert and his proposed testimony. While the circuit court did not specifically reference Wis. Stat. § 904.03, it can reasonably be inferred from the court's oral decision that the court was also concerned about confusion of the issues and the needless presentation of cumulative evidence.

However, even if the circuit court had erred, the error was harmless here. The test for harmless error was set forth by this court in *State v. Harvey*, 2002 WI 93, ¶ 46, 254 Wis. 2d 442, 647 N.W.2d 189. Applying the test laid out by the United State Supreme Court in Neder v. United States, 527 U.S. 1, 119 S. Ct. 1827 (1999), the Harvey court articulated the harmless error inquiry as whether it is " 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " *Harvey*, 254 Wis. 2d, ¶ 46 (quoting *Neder*, 527 U.S. at 18). "In other words, if it is 'clear beyond a reasonable doubt that a rational jury would have [rendered the same verdict] absent the error,' then the error did not 'contribute to the verdict,' " and is therefore harmless. *Hannemann v. Boyson*, 2005 WI 94, ¶ 57, 282 Wis. 2d 664, 698 N.W.2d 714 (quoting *Neder*, 527 U.S. at 15, 18).

¶ 19. Applying *Harvey* and *Neder* to this case, we conclude that even if the circuit court's exclusion of Shomberg's expert testimony did amount to error, the error was harmless. We believe it is clear beyond a reasonable doubt that a rational jury would have reached the same result as the circuit court did for two reasons. First, although the court was limited to basing the decision on evidence in the record as a jury would have been, there was a vigorous cross-examination of three key witnesses.[9] During the cross-examinations, counsel was able to flesh out factors that could cast doubt on the reliability of a witness's identification. Second, in addition to the eyewitness identifications, there was strong evidence in the record of Shomberg's guilt.

---

[9] *See Infra,* ¶¶ 28–29.

¶ 20. There are several other pieces of evidence which support our conclusion that a rational jury would find Shomberg guilty of the sexual assault beyond a reasonable doubt. First, Shomberg was immediately identified from the police sketch by both his parole officer, and by an acquaintance who resided with Shomberg in February 2002 in a drug rehabilitation facility. When each viewed the sketch that had been published in the newspaper, each independently contacted the police identifying the person in the sketch as Shomberg.

¶ 21. Second, Shomberg wrote a letter to his friends/alibi witnesses, asking them to corroborate his story. Shomberg's letter recounts in great detail the version of the events he had related to police concerning his whereabouts on March 8 and 9, 2002, and his being in the presence of these persons at the time of the assault. The police had asked Shomberg repeatedly about contact with his alibi witnesses, lest their credibility be called into question. On April 10 Shomberg wrote a letter to an alibi witness, Elizabeth Granby, who, at the time, lived in an apartment with her boyfriend, Pat Fiegel, another of Shomberg's friends and alibi witnesses. On April 11 Detective Wall met with Shomberg and specifically asked him if he had contacted Granby or Fiegel. Shomberg said he had not.

¶ 22. Third, Ferguson had reported to the police that the assailant was wearing a long-sleeved gray knit shirt or sweatshirt. In court, Ferguson positively identified a long-sleeved gray sweater that police had recovered from Shomberg's grandmother as belonging to Shomberg. Shomberg often stayed with his grandmother.

¶ 23. Fourth, Shomberg's alibi witnesses were not determined to be credible by the circuit court. The trier

of fact is in the best position to judge the credibility of the witnesses. In this case, the circuit court found that various inconsistent statements, admissions of lies or a willingness to lie to police, and difficulties answering questions directly, destroyed the credibility of Shomberg's alibi witnesses.

¶ 24. Finally, it is significant that although the lineups were simultaneous in form, they were sequential in fact. Both S.B. and Ferguson stated that they recognized Shomberg as soon as he walked through the door. Shomberg was the second person to enter the room. S.B. told the court on direct examination that "I was looking at each one trying to see if they resembled the person that assaulted me that night, and right away I picked out number five [Shomberg]. His face and just the way his body was built was exactly like the man who assaulted me." Similarly, Ferguson's trial testimony on direct examination indicates that the problems of relative judgment and the comparative nature of simultaneous lineups were not a factor in this case.

> MR. KAISER, Q. As you were watching the people come onto the stage, who, if anyone, did you see?
>
> FERGUSON, A. I saw the perpetrator that I had identified the night of the attack.
>
> Q. Did you recognize him as he was walking through the door?
>
> A. Yes, I did.

¶ 25. From this testimony it appears clear that what occurred was recognition memory, not relative judgment. Therefore, for all of these reasons, we conclude that even if excluding Shomberg's expert eyewitness testimony had constituted error, the error was harmless.

¶ 26. Next, we must determine whether Shomberg was denied his constitutional right to present a defense. "This determination is a question of 'constitutional fact' that this court determines independently of the circuit court and the court of appeals but benefiting from their analyses." *St. George,* 252 Wis. 2d 499, ¶ 16 (footnote omitted). We conclude that the court's decision to exclude expert eyewitness testimony did not deprive Shomberg of his constitutional right to present a defense.

¶ 27. In *St. George,* this court held that the circuit court's exclusion of testimony of a defense expert about the victim's recantation, and about interview techniques particular to child sexual assault cases, unconstitutionally deprived the defendant of his right to present a defense. *St. George,* 252 Wis. 2d 499, ¶ 73. In *St. George,* this court applied a two-part inquiry "[f]or the defendant to establish a constitutional right to the admissibility of the proffered expert witness testimony. . . ." *Id.,* ¶ 53. "In the first part of the inquiry, the defendant must satisfy each of the following four factors through an offer of proof." *Id.,* ¶ 54. First, the testimony of the expert must meet "the standards of Wis. Stat. § 907.02 governing the admission of expert testimony." *Id.* (footnote omitted). Second, the expert witness's testimony must be "clearly relevant to a material issue in [the] case." *Id.* (footnote omitted). Third, the expert testimony must be "necessary to the defendant's case." *Id.* (footnote omitted). Finally, "[t]he probative value of the testimony of the defendant's expert witness [must] outweigh[] its prejudicial effect." *Id.* If the defendant is able to satisfy "these four factors

to establish a constitutional right to present the expert testimony, a court undertakes the second part of the inquiry by determining whether the defendant's right to present the proffered evidence is nonetheless outweighed by the State's compelling interest to exclude the evidence." *Id.,* ¶ 55 (footnote omitted).

¶ 28. Applying the facts of this case to the first part of the inquiry, we conclude that even though the first, second and fourth factors are arguably met (making no assessment as to the qualification of the individual to testify as an expert), Shomberg failed to establish that the expert eyewitness testimony was necessary to his case. Although the expert himself did not testify, Shomberg's counsel was able to convey adequately the concepts of relative judgment and recognition memory, as well as the factors present in this case that would tend to render the eyewitness' testimony unreliable in his cross-examinations of both S.B. and Ferguson.

CROSS-EXAMINATION OF S.B.

MR. COHEN, Q. And it's 3:00 in the morning, so we know it's dark out, right?

. . . .

S.B., A. Yes.

Q. The street light's on, but that's it, right?

A. Right.

Q. And the only lighting there is very shadowy, right?

A. Right.

. . . .

Q. And the person you saw when you saw that face, you saw that face for a split second, right?

A. Right.

. . . .

A. I turned around and saw his face, and he like whipped me off into the air at that same split second. You know, it happened very fast.

Q. Okay. Very fast. All right. And you never see the suspect again?

A. No.

. . . .

Q. So the only way you knew that you could estimate as to what his body was like was how he felt behind you?

A. Yeah.

Q. Okay, Because you never – you never could look at his body, right? You never did in fact look at his body, did you?

A. No.

. . . .

Q. Okay. You didn't say look, I'd recognize that guy in a minute, I really got just a great look at this guy. You said possibly.

A. Yeah. I said possibly.

Q. Now, you went to the lineup, right?

A. Yes.

Q. How did you know to come to a lineup?

21

A. I got a phone call telling me to come.

. . . .

Q. And so this was now about a month after the incident, right?

A. Right.

Q. And you thought well, sounds like the police did their work and they might have somebody, right?

A. Right.

Q. And you went to that lineup, and they brought six people out and they were all in jail outfits, right?

A. Right.

Q. So you knew that whoever it was was already arrested, right?

A. Right.

. . . .

Q. And the person you picked out was essentially the best of the six people there, right?

A. Right.

Q. But you really weren't sure, were you?

A. I was not a hundred percent sure.

Q. You weren't even — basically, what you were sure is he was the best of the six, but that's all you were sure of, right?

A. Right.

. . . .

Q. He very well could have not been the guy; he just was the best of the six?

A. Right.

Q. And basically, I think you said to the police officer he was the closest, right?

A. Right.

Q. Never said that's the guy, did you?

A. No, not that I remember.

Q. Because you weren't really sure.

A. Right.

Q. And when they brought the six people in, you know right away it couldn't be number one, three, and six because they were too big, right?

A. Right.

. . . .

Q. And that left two, four, and five, right?

A. Right.

Q. And you knew it couldn't be two and four because they were too old, right?

A. Right.

Q. What did that leave?

A. Five.

Q. Number five, and that's why you picked him out, right?

A. Right.

23

Q. He was the best, and in fact, he was the only one left after you eliminated the other five people?

A. That's right.

CROSS-EXAMINATION OF ALAN FERGUSON

MR. COHEN, Q.: Now, you got a call to come to the lineup, right?

FERGUSON, A.: Yes

. . . .

Q. Okay. And she [Detective Ricksecker] said something like hey, we've caught a suspect, want you to come down and look at a lineup?

A. Something like that.

. . . .

Q. Okay. Now, you picked out the person who was number five at the lineup, right?

A. Yes.

Q. And you said he looks familiar from the assault?

A. Okay. Yes.

Q. Those are the words you used, familiar?

A. That sounds –

Q. Familiar, does that mean like similar?

A. It's semantics. . . . .

Q. Well, your words were he looked familiar from the sexual assault?

. . . .

24

A. Right.

. . . .

Q. And then you went on to say he looked very similar to the person I saw that I followed?

A. Correct.

Q. You didn't say that's the guy. You said he looks similar to the guy?

A. Correct.

. . . .

Q. They asked you how sure you were, and you said I'd say about 90 percent?

A. Right.

¶ 29. In addition, in his cross-examination of Detective Marion Morgan, counsel for Shomberg was able to convey the concept that some experts believe sequential lineups are relatively more reliable than simultaneous lineups, and the reasoning thereof, as Detective Morgan had attended training on eyewitness identification given by Shomberg's expert, which was also attended by Shomberg's counsel.

MR. COHEN, Q: Did you go to any kind of training on lineup, sequential versus simultaneous?

DET. MORGAN, A: Yes, I did.

. . . .

Q. And you learned why simultaneous lineups like the one that occurred tend to be unreliable, right?

. . . .

25

A. There were some discussion about why that presenter didn't believe they were as reliable.

Q. Part of the problem is that it gets to be comparative. The witness who is watching the lineup tries to figure out which one most resembles the person, right?

A. That's what the instructor said, yes.

Q. And the instructor also gave us examples how, when they remove the actual suspect from a lineup and show another lineup without that person, other people tend to get picked out because they remove the actual suspect, right?

. . . .

A. I don't remember that specific example.

Q. Do you remember many discussions about the problems, though, with comparison when you look at six people?

A. Yes, and actually, I believe most of that was directed toward photo arrays as opposed to in person.

Q. And lineups too?

A. Okay.

Q. City of Madison is now doing a sequence lineup program now, are they not?

. . . .

A. Yes, we will be trained in that.

Q. Because it tends -- because statistics tends to show that you have less false positives that way, right?

A. That's part of the training that they plan to present.

26

¶ 30. We do not believe the exclusion of the expert testimony deprived Shomberg of his constitutional right to present a defense, as it had in *St. George*. In that case, the five-year-old daughter of the defendant's long-term girlfriend told her mother that the defendant had fondled her vagina the previous night as the three slept in the mother's bed. *St. George*, 252 Wis. 2d 499, ¶¶ 7–8. Over the next few months, the daughter "allegedly also reported the fondling to a doctor and a social worker." *Id.*, ¶ 8. "The defendant. was charged with first-degree sexual assault of a child, contrary to Wis. Stat. § 948.02(1)(1999–2000)." *Id.* (footnote omitted).

¶ 31. "At trial, [the daughter] denied the incident had ever occurred and even that she had ever made some of the reports." *Id.*, ¶ 9. The defendant sought to introduce his own expert to testify on recantation in child sexual assault cases, but the court excluded the testimony. *Id.*, ¶ 5. A jury found the defendant guilty, and he was sentenced to 20 years in prison. *Id.*, ¶ 10. The defendant challenged his conviction by arguing that the circuit court's exclusion of the testimony of his expert witness deprived the defendant of his constitutional right to present a defense. *Id.*, ¶ 30. This court agreed, concluding that "exclusion of the testimony of the expert witness about recantation and interview techniques denied the defendant his constitutional right to present evidence clearly central to his defense." *Id.*, ¶ 73.

¶ 32. The facts of *St. George* are distinguishable from this case in three critical respects. First, *St. George* involved the recantation of an alleged victim of child sexual assault. Recantation is a subject clearly beyond the common knowledge or understanding of a jury or other fact finder. As such, it is an example of an area of "specialized knowledge that will assist the trier

27

of fact to understand the evidence or to determine a fact in issue" as contemplated by Wis. Stat. § 907.02. Second, the state in *St. George* relied upon expert testimony to support its case. The defendant was prevented from presenting expert testimony to rebut that of the state. Third, the state emphasized in closing argument that the defendant had failed "to rebut the testimony of the State's two expert witnesses." *Id.,* ¶ 65.

¶ 33. In contrast, Shomberg's expert was to testify on eyewitness identifications. The difficulties with eyewitness identification are something we all have some appreciation for as part of our common knowledge and understanding. In addition, in this case, the State of Wisconsin presented no expert testimony supporting the accuracy of the eyewitness identifications. Therefore, unlike the defendant in *St. George,* there was no expert testimony to rebut, and no inference of guilt due to the absence of rebuttal.

¶ 34. In addition, Shomberg presented an entirely separate alibi defense. There were two elements to Shomberg's defense. First, that S.B. and Ferguson misidentified him as the assailant. Second, that on the evening of March 8 and through the night until the morning of March 9, he was 30 blocks from the scene of the assault, at an apartment with several friends.

¶ 35. The dissent's reliance on the use of the word "might" in *Taylor v. Illinois,* 484 U.S. 400, 408 (1988) (Justice Butler's dissent, ¶ 75) is misplaced. A more recent discussion from the United States Supreme Court has clarified the right to present a defense by use of an expert witness. The Court has repeatedly held that "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer,* 523 U.S. 303, 308 (1998) (citing *Taylor,* 484 U.S. at 410; *Rock v. Arkansas,*

483 U.S. 44, 55 (1987); *Chambers v. Mississippi,* 410 U.S. 284, 295 (1973) (footnote omitted)). Therefore, under some circumstances, "[a] defendant's interest in presenting such evidence may thus 'bow to accommodate other legitimate interests in the criminal trial process.'" *Id.* (citations omitted). Moreover, the Court has found "the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." *Id.* (citations omitted). The Court noted that the exclusions of evidence it had declared unconstitutional "significantly undermined fundamental elements of the defendant's defense." *Id.* at 315. The same cannot be said here.

¶ 36. Here, as in *Scheffer,* "the court . . . heard all the relevant details of the charged offense from the perspective of the accused," and the exclusion of expert testimony "did not preclude him from introducing any factual evidence." *Id.* at 317. The *Scheffer* court concluded that "respondent was barred merely from introducing expert opinion testimony to bolster his own credibility," and therefore concluded that "respondent's defense was [not] significantly impaired by the exclusion. . . ." *Id.*

¶ 37. When we consider the information elicited by Shomberg's counsel during cross-examination of the three witnesses noted earlier, opening statements and closing arguments, and his alibi defense, we conclude that the testimony of Shomberg's expert was not necessary to his defense. Therefore, Shomberg's constitutional right to present a defense was not violated by the exclusion of expert eyewitness testimony. As the first portion of the inquiry was not satisfied, we need not proceed to the second part of the *St. George* inquiry.

29

V

¶ 38. We are satisfied that Shomberg should not be granted a new trial in the interest of justice. "This court may exercise its power of discretionary reversal under the first part of Wis. Stat. § 751.06, without finding the probability of a different result on retrial when it concludes that the real controversy has not been fully tried." *State v. Hicks,* 202 Wis. 2d 150, 160, 549 N.W.2d 435 (1996) (citations omitted). We have explained that we will determine that the real controversy has not been fully tried if the fact finder "was erroneously not given the opportunity to hear important testimony that bore on an important issue of the case. . . ." *Id.* In *Hicks,* the court found that the jury had not heard about DNA evidence that excluded Hicks as the donor of one of the hair specimens. *Id.* at 161. As the excluded DNA evidence was relevant to the critical issue of identification, the court in *Hicks* determined the real controversy had not been fully tried. *Id.* at 172. As we stated earlier, the circuit court as the fact finder in this case was not denied the opportunity to hear important testimony regarding the identification of Shomberg, since such testimony was provided through cross-examinations discussed herein, and such issues were also referred to extensively during opening statements and closing arguments. We conclude that the real controversy in this case has been fully tried, and, therefore, Shomberg should not be granted a new trial.

VI

¶ 39. Finally, we determine that the circuit court did not erroneously exercise its discretion in refusing to

30

admit testimony regarding Shomberg's offer to take a polygraph examination. The result of a polygraph test is inadmissible in Wisconsin. *See State v. Dean,* 103 Wis. 2d 228, 278–79, 307 N.W.2d 628 (1981). Yet, "an offer to take a polygraph test is relevant to an assessment of the offeror's credibility and may be admissible for that purpose." *State v. Pfaff,* 2004 WI App 31, ¶ 26, 269 Wis. 2d 786, 676 N.W.2d 562 (citing *State v. Hoffman,* 106 Wis. 2d 185, 217, 316 N.W.2d 143 (Ct. App. 1982)). However, such an offer is only "relevant to the state of mind of a person making the offer as 'long as the person making the offer believes that the test or analysis is possible, accurate, and admissible.' " *Neumann v. Neumann,* 2001 WI App 61, ¶ 65, 242 Wis. 2d 205, 626 N.W.2d 821 (quoting *State v. Santana-Lopez,* 2000 WI App 122, ¶ 4, 237 Wis. 2d 332, 613 N.W.2d 918).

¶ 40. The evidence in the record is insufficient to establish that Shomberg offered to take a polygraph examination, as opposed to agreeing to take one. *See Neumann,* 242 Wis. 2d, ¶ 64. During the court's ruling on the motion to admit the polygraph offer, Shomberg's counsel first explained: "I talked to Mr. Shomberg fairly soon after this case got started as to whether or not he'd be willing to take a polygraph. He said he would." Shortly thereafter, however, counsel for Shomberg clarified: "When I talked to Mr. Shomberg about this, and I'm sorry if I sound like I'm back-peddling. I stated it off hand before. We talked about the lie box, and I suspected it was Mr. Shomberg who first brought that up to me, 'hey, can I take a lie box. . . .' " Shomberg himself did not testify about whether he offered to take a polygraph. We believe, therefore, there is insufficient support in the record to conclude that Shomberg initiated the offer to take a polygraph test.

¶ 41. Neither does evidence in the record support the second requirement to admit an offer to take a polygraph — that Shomberg believed the results of a polygraph would be admissible in court. Again, Shomberg did not testify on his belief concerning admissibility. Counsel for Shomberg stated "He was aware that the general rule is it's not admissible, but there was also this new stuff coming in from the Department of Corrections where they were using them all the time, and the hope was that the Court would let us get these results in." With no other facts in the record to indicate that Shomberg believed the results of a polygraph test would be admissible in court, we conclude that the circuit court did not err in its exclusion of Shomberg's offer to take a polygraph examination.

## VII

¶ 42. In its amicus brief, the Innocence Project of the Frank J. Remington Center, University of Wisconsin Law School, asked this court to adopt a presumption of admissibility of expert eyewitness testimony in cases involving eyewitness identification. We decline to do so. Our concern is that adopting a presumption would all but eliminate the discretion of the circuit court on such evidentiary matters. Most troubling is that if we did adopt such a presumption, there is no clear guidance as to when and how such a presumption could be overcome.

¶ 43. However, we encourage circuit court judges to carefully consider, in each case, whether the admissibility of eyewitness expert testimony would be helpful to the trier of fact. Because of our growing appreciation for the difficulties inherent in eyewitness identification, we appreciate the work of the Department of Justice

32

and the legislative task force in the development, education and promotion of better practices and procedures for eyewitness identification including, but not limited to, lineups.

## VIII

¶ 44. In sum, we conclude that the circuit court did not, at the time of its decision in 2002, erroneously exercise its discretion in excluding the expert testimony on eyewitness identification proffered by Shomberg. We also determine that even if the circuit court did commit error, any such error was harmless. Further, we hold that the absence of expert testimony on eyewitness identification did not deprive Shomberg of his constitutional right to present a defense. In addition, we determine that Shomberg should not be granted a new trial in the interest of justice, as the real controversy in this case has been fully tried. Finally, we conclude that the offer to take a polygraph was properly excluded, because there was insufficient evidence in the record to find either that Shomberg had initiated the offer to take a polygraph examination, or that he believed the results of the test were admissible.

*By the Court.* The decision of the court of appeals is affirmed.

¶ 45. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). This case turns on eyewitness identification and alibi evidence.

¶ 46. I agree with Justice Butler that a significant failure of communication occurred between the circuit court and defense counsel regarding the nature of the expert witness testimony proffered by the defendant Shomberg on eyewitness identification. The record evidences a disconnect between the expert evidence proffered by Shomberg regarding eyewitness identification

33

and the circuit court's appreciation of the significance of the proffered evidence.

¶ 47. The defense expert witness sought to emphasize the weakness of an identification made in a lineup in which all persons are shown to an eyewitness at the same time (a simultaneous lineup),[1] as compared to an identification made when the persons are shown to an eyewitness one at a time (sequential lineup) and the eyewitness is asked to state after seeing each person whether that person is or is not the suspect.

¶ 48. The circuit court did not appear to appreciate the import of the proffered expert witness testimony relating to simultaneous lineups compared to sequential lineups. Instead of focusing on the weaknesses inherent in a simultaneous lineup in determining whether to admit expert testimony, the circuit court kept returning to the expert's testifying to other weak-

---

[1] The defense motion stated the following factors about which the defense expert, Paul Carroll, would testify:

> Mr. Carroll would testify about several factors that psychologists specializing in the field of human perception and memory agree have an important bearing on a witness'[s] ability to identify a stranger. These factors are, among others: That sequential lineups are much more reliable and accurate than simultaneous lineups; relative judgment, which occurs when a witness at a line-up eliminates who the perpetrator could not be rather than identifies the actual perpetrator; transference, a mental process that can occur when some period of time separates the initial perception and the later identification; the absence of a reliable relationship between the confidence a witness has in his identification and the accuracy of that identification; how I.D. evidence is often unreliable and there are scores of examples of people wrongly convicted of crimes based solely on an incorrect I.D. witness; that the factors present in this case would tend to render the eyewitnesses' testimony unreliable.

At oral argument the State asserted that the defense's offer of proof was inadequate.

nesses of eyewitness identification, many familiar to triers of fact, such as the effect of stress, darkness, and limited opportunity to observe on the reliability of eyewitness identification. The circuit court then excluded the expert's testimony as not helpful.

¶ 49. If the majority opinion is saying that the circuit court already knew about "relative judgment" in simultaneous lineups, then it was proper not to admit the testimony. The interaction between the circuit court and defense counsel clearly demonstrates, however, that the circuit court did not fully understand Shomberg's offer of proof. The circuit court repeatedly strayed away from factors that require expert testimony such as relative judgment and back to factors such as lack of light and whether the eyewitness had been drinking, which are decidedly different.

¶ 50. Furthermore, the circuit court conceded that, at least prior to the offer of proof, it lacked knowledge or understanding of relative judgment, stating that it had never heard of the term "relative judgment" prior to reading the expert report. The court and defense counsel's exchange was as follows:

> THE COURT: So what we're back to is his opinion that sequential is better than simultaneous.
>
> MR. COHEN [DEFENSE COUNSEL]: And why.
>
> THE COURT: Because simultaneous means the person, the witness, in essence, has the burden of making a positive identification as opposed to simply eliminating people that the witness does not feel were the perpetrator with the, I guess implicit within the witness's belief, that one of these people must be the perpetrator.
>
> MR. COHEN: Yes. Relative judgment.
>
> . . . .

35

For instance, I didn't know the term relative judgment, in terms of how it affects someone selecting somebody in a six-person lineup. That's not a term I was familiar with. I don't know if the Court was.

THE COURT: No.

But as it relates to these areas, I'm having a problem seeing why this could not be adequately explored by cross-examination of any witness who testifies, as to identification . . . .

¶ 51. If the majority opinion is saying that the circuit court read the offer of proof (which included the expert's report) and gleaned from that report any relevant testimony that the defense expert would have given, this analysis is problematic. It clearly would have been error for the circuit court to consider expert testimony that it had ruled inadmissible.

¶ 52. The dialogue between defense counsel and the circuit court showing the miscommunication on this issue is set forth in Appendix A at the end of this dissenting opinion.

¶ 53. When Shomberg's trial was held in 2002, many judges and counsel in Wisconsin evidently had not yet explored the problems associated with simultaneous lineups.[2] Indeed, simultaneous lineups were the norm and any attack on a well-conducted lineup was counter to then-held views. The majority opinion appears to justify upholding the circuit court's exclusion of the defendant's expert witness on the ground that the expert witness would offer a relatively new explanation of the weakness of simultaneous lineups.[3] The majority opinion acknowledges that the problems associated

---

[2] *See* majority op., ¶ 15.

[3] *See* majority op., ¶ 17.

with simultaneous lineups are not even so well-known in 2006 as to render expert testimony not helpful to a finder of fact.[4]

¶ 54. As I see it, that the expert opinion offered was relatively unknown information is the very reason the circuit court should have admitted the testimony in the present case. The subject of the expert testimony was not generally known to triers of fact in Wisconsin in 2002. The proffered testimony was apparently specialized knowledge at the time of Shomberg's trial. These factors are precisely why the expert testimony would have been of assistance to the trier of fact in the present case, was essential to the defense, and should have been admitted.[5]

¶ 55. The circuit court did not fully appreciate, as the expert witness would have testified, that when a witness is given a simultaneous presentation of subjects, the witness tends to make relative judgments, comparing one person in the lineup with the others and identifying the person who looks most like the actual perpetrator. This tendency to make relative judgments does not usually pose a problem if the actual perpetrator is present; the witness will ordinarily identify the perpetrator. But if the perpetrator is not in the lineup, the witness will tend to identify the person in the lineup who looks most like the witness's recollection of the suspect. A simultaneous lineup thus encourages a witness to select the "best" match, making a comparative

---

[4] Id.

[5] Wisconsin Stat. § 907.02 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

judgment about the persons in the lineup, rather than making an absolute judgment about each person presented.[6]

¶ 56. Researchers have learned that presenting persons one at a time, sequentially, helps witnesses to make absolute judgments rather than comparative ones. Research suggests that the value of identifications made under sequential presentations is significantly greater than that of those made under simultaneous presentations.[7]

¶ 57. Relying on what it describes as "scientific rationale," emphasizing relative judgment and suggestiveness, the Wisconsin Department of Justice recently adopted a model policy calling for sequential lineups.[8] A Wisconsin legislative task force charged with address-

[6] Bureau of Training and Standards for Criminal Justice, Wisconsin Dep't of Justice, *Model Policy and Procedure for Eyewitness Identification* at 5 (Sept. 12, 2005), *available at* http://www.doj.state.wi.us/dles/tns/EyewitnessPublic.pdf. *See also* Legislative Task Force (Avery Task Force), *Eyewitness Identification Procedure Recommendations* at 2–3, *available at* http://www.law.wisc.edu/fjr/innocence/eyewitness_guidelines.htm; Gary L. Wells, *Eyewitness Identification Evidence: Science and Reform,* The Champion, Apr. 2005, at 14.

[7] Bureau of Training and Standards for Criminal Justice, Wisconsin Dep't of Justice, *Model Policy and Procedure for Eyewitness Identification* at 5 (Sept. 12, 2005), *available at* http://www.doj.state.wi.us/dles/tns/EyewitnessPublic.pdf. *See also* Legislative Task Force (Avery Task Force), *Eyewitness Identification Procedure Recommendations* at 2–3, *available at* http://www.law.wisc.edu/fjr/innocence/eyewitness_guidelines.htm; Gary L. Wells, *Eyewitness Identification Evidence: Science and Reform,* The Champion, Apr. 2005, at 14.

[8] Bureau of Training and Standards for Criminal Justice, Wisconsin Dep't of Justice, *Model Policy and Procedure for Eyewitness Identification* at 5 (Sept. 12, 2005), *available at*

ing wrongful convictions has recently made a similar recommendation.[9] These recommendations are the result of extensive study that demonstrates that, contrary to the previously held view, there are substantial problems with eyewitness identification in general and simultaneous lineups in particular. In the recent *Dubose* case, the court identified the problems and risks associated with eyewitness identification in general.[10] This case presents the problems and risks associated with simultaneous lineups in particular.

¶ 58. That the circuit court did not fully appreciate the import of the evidentiary offer is understandable and, in essence, makes Shomberg's point.

¶ 59. The majority opinion concludes that the lineup in which Shomberg was identified was "sequential in fact."[11] Defense counsel's cross-examination of the eyewitness made clear, however, that even if she believed she recognized Shomberg as he entered the lineup, her identification was a product of relative judgment. The witness testified as follows:

> Q And when they brought the six people in, you knew right away it couldn't be number one, three, and six because they were too big, right?
>
> A Right.
>
> . . . .

http://www.doj.state.wi.us/dles/tns/EyewitnessPublic.pdf. The policy also recommends numerous other changes in eyewitness identification procedure.

[9] Legislative Task Force (Avery Task Force), *Eyewitness Identification Procedure Recommendations, available at* http://www.law.wisc.edu/fjr/innocence/eyewitness_guidelines.htm.

[10] *State v. Dubose,* 2005 WI 126, ¶ 30, 285 Wis. 2d 143, 699 N.W.2d 582.

[11] Majority op., ¶ 24.

Q And that left two, four, and five, right?

A Right.

Q And you knew it couldn't be two and four because they were too old, right?

A Right.

Q What did that leave?

A Five.

Q Number five, and that's why you picked him out, right?

A Right.

Q He was the best, and in fact, he was the only one left after you eliminated the other five people?

A That's right.

Q And you didn't pick him out because for sure that was the guy, just he was the best of the six?

A Right.

¶ 60. The majority opinion asserts that the defense was able to convey through cross-examination of Detective Marion Morgan, a state witness, "the concept that some experts believe sequential lineups are relatively more reliable than simultaneous lineups."[12] The detective's testimony on cross-examination was based on attending training on eyewitness identification given by Shomberg's proffered expert. It is extraordinarily weak. The cross-examination fails to explain the research or to make the points that the defense's expert witness could have made about a witness's relative judgment in a simultaneous lineup.

[12] Majority op., ¶ 29.

¶ 61. The defense counsel obviously tried to drag information favorable to the defendant out of the State's witness but was hampered by the witness and the assistant district attorney's objections.

¶ 62. Furthermore, the detective insisted that her training about simultaneous and sequential identification related to identifications from a photo array, not to the kind of lineup involved in the present case. Her cross-examination is set forth in Appendix B at the end of this dissenting opinion.

¶ 63. For the reasons set forth, I dissent. I conclude that the defense's expert witness testimony relating to relative judgment in simultaneous lineups was necessary to the defendant's case; its exclusion was a due process violation of Shomberg's right to present a defense.[13]

## APPENDIX A.
## Defense Dialogue with Circuit Court

¶ 64. At the motion hearing, the circuit court and Shomberg's attorney then had the following exchange regarding the offer of proof:

> MR. COHEN [defense counsel]: . . . When you look at six people in a lineup, you think to yourself which is the person that most looks like the person I'm looking for, and you use relative judgment, and that's what makes a simultaneous lineup very unreliable.
>
> . . . .
>
> Mr. Carroll can tell you . . . that by using a sequential lineup, you tend to eliminate all the false positives without eliminating the correct positives . . . .
>
> Why that's important, when we bring somebody in

---

[13] *See State v. St. George*, 2002 WI 50, 252 Wis. 2d 499, 643 N.W.2d 777.

for a lineup, they tend to think, hey, I'm here for a lineup, they must have caught the guy, now I got to figure out which of these six people did it, and that is relative judgment.

. . . .

I think the most important thing this expert can tell you is why the process we're using leads to mistakes.

. . . .

THE COURT: . . . I'll make a preliminary ruling.

First of all, as it relates to the opinions that the defense is seeking to elicit from Mr. Carroll, I'm not going to allow that for the following reasons:

The bottom line is, the defense seeks to ask Mr. Carroll, in his capacity as an expert, or perception as an expert, as to the reliability of identification by the complaining witness and by the security guard.

I think that does invade the province of the jury and, yet, I don't see how it assists the jury.[14]

. . . .

This holding would be consistent with the *Hampton* case, as well as *Blair* and *Wilson.*

Specifically, the judge in the *Hampton* case ruled that "the defendant's expert witness would be limited in his testimony to simply listing the different factors affecting human perception, but would not be allowed to give an opinion as to the reliability of the specific identification of the defendant by Mrs. Schlieve." . . .

---

[14] *But see* Wis. Stat. § 907.04 (providing that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact").

. . . .

Now Mr. Cohen's motion . . . indicates that the expert would testify that there are factors that may influence a witness's ability to identify a stranger.

. . . .

Mr. Cohen, how is this going to, if I allow this, is this going to assist the trier of fact?

. . . .

. . . I cannot in any way envision allowing the trier of fact to hear the fact that New Jersey mandates sequential lineups as opposed to simultaneous lineups. I don't see what bearing that has.

MR. COHEN: Mandates is not that important, but what is important, the reasons why it's become the preferred method of doing it.

. . . .

THE COURT: So what we're back to is, you want to call this individual who will opine that sequential lineups are better than simultaneous lineups?

MR. COHEN: And the reason why, not just that they're better, but here's why. Here's [sic] the problems with simultaneous ones.

THE COURT: Because, in part, it's a process of elimination as opposed to positive identification.

MR. COHEN: The fact that exactly, at least part of what the victim said, when she put down her answer, "Well, I knew it wasn't one and three because they were too big. I knew it wasn't two and four because they were too old."

43

THE COURT: But isn't that something that you would also ask the witness on cross-examination?

MR. COHEN: I sure could. I sure could, but it's a process that, I think it's important. What I was impressed with was the experiments that they have done. That really sort of, you know, sewed it up for me. This was really a much better way of doing it.

. . . .

THE COURT: So what we're back to is his opinion that sequential is better than simultaneous.

MR. COHEN: And why.

THE COURT: Because simultaneous means the person, the witness, in essence, has the burden of making a positive identification as opposed to simply eliminating people that the witness does not feel were the perpetrator with the, I guess implicit within the witness's belief, that one of these people must be the perpetrator.

MR. COHEN: Yes. Relative judgment.

. . . .

For instance, I didn't know the term relative judgment, in terms of how it affects someone selecting somebody in a six-person lineup. That's not a term I was familiar with. I don't know if the Court was.

THE COURT: No.

But as it relates to these areas, I'm having a problem seeing why this could not be adequately explored by cross-examination of any witness who testifies, as to identification and, again, what we're back to is, how much light was available, how much did someone have to drink, did you take any drugs, were you

44

under any type of stress, how close was the person, was their fact in any way obstructing [sic], what was the period of time between which this occurred and you were first shown this lineup.

I don't see so far how any of those factors would require the assistance of an expert witness.

. . . .

I don't think the areas we're talking about require the assistance of an expert because it gets down to the same factors that the trier of fact would consider . . . .

. . . .

I say that having reviewed . . . Mr. Carroll's report, as well as his CV, and when I look at page three of that report, taking up those opinions one by one . . . I realize they're offered as the basis for his opinion, that ultimately the reliability is suspect, of the eyewitness identification, number one, several minor inconsistencies found in police reports, that's something that can be brought out on cross-examination.

Number two, again, that's his opinion when he states, "Neither the victim or the witness identify the suspect."

The trier of fact will hear the exact testimony in that regard. I don't think anybody under the auspices of being an expert witness would be allowed to testify, "If we are to convict suspects on this type identification, then at least 10 percent of those convicted would be innocent."

. . . .

Number three, again, "Victim B[.] isn't identifying the person that she remembers from the incident, but is instead identifying those persons who couldn't have

45

committed the crime," that's a matter that the trier of fact can consider unassisted by Mr. Carroll.

Four, "Eyewitness identification remains as one of the most influential types of evidence. Studies indicate that jurors believe eyewitness evidence more than fingerprint evidence."

I don't see how that's relevant or should be considered by the trier of fact.

And then, five, again, relates to his opinion about when eyewitness testimony is more reliable, but it would consider the same types of factors that the trier of fact would as it relates to those studies.

As it relates to those studies, I don't believe that would assist the trier of fact, it would simply invade their province, so for all of those reasons, I'm going to deny the motion to admit expert eyewitness testimony.

## APPENDIX B.
### Defense counsel's cross-examination of Detective Morgan

¶ 65. The following is the cross-examination relating to simultaneous and sequential lineups:

Q [defense counsel] Did you go to any kind of training on lineup, sequential versus simultaneous?

A [Detective Morgan] Yes, I did.

Q Same one I was at?

A Yes.

Q And you learned why simultaneous lineups like the one that occurred tend to be unreliable, right?

46

MR. KAISER [Assistant District Attorney]: Objection; relevance.

THE COURT: Overruled.

A There were [sic] some discussion about why that presenter didn't believe they were as reliable.

Q Part of the problem is that it gets to be comparative. The witness who is watching the lineup tries to figure out which one most resembles the person, right?

A That's what the instructor said, yes.

Q And the instructor also gave us examples how, when they remove the actual suspect from a lineup and show another lineup without that person, other people tend to get picked out because they remove the actual suspect, right?

MR. KAISER: Objection; relevance of specific examples of other lineups and how they were conducted.

THE COURT: Well, this relates to her training and so I think it's within her general realm of knowledge, so overruled.

Q You understand my question, right?

A One more time, please?

Q The instructor showed you examples where six people are in a photo array and someone, a group of people have seen what the person looked like and they're supposed to pick out which of the six it was, and then they do the same thing again but take out the one who's picked out by the highest percentage of the witnesses, run the whole thing again, and the other five, their percentages all go up as a result, right?

MR. KAISER: Objection; relevance of photo arrays.

47

THE COURT: Overruled.

Q Do you remember that?

A I don't remember that specific example.

Q Do you remember many discussions about the problems, though, with comparison when you look at six people?

A Yes, and actually, I believe most of that was directed towards photo arrays as opposed to in person.

Q And lineups too?

A Okay.

Q City of Madison is now doing a sequence lineup program now, are they not?

MR. KAISER: Objection; relevance.

THE COURT: Overruled.

A Yes, we will be trained in that.

Q Because it tends -- because statistics tends to show that you have less false positives that way, right?

A That's part of the training that they plan to present.

Q But you know that already, right?

A I'm not trying to be difficult, but I really think that the training was specifically directed towards photo lineups.

¶ 66. LOUIS B. BUTLER, JR., J. (*dissenting*). The majority concludes that the circuit court did not erroneously exercise its discretion in excluding the expert testimony on eyewitness identification proffered by the defendant, and that the absence of such

48

testimony did not deprive him of his constitutional right to present a defense. Because I disagree with these conclusions, and because I conclude that there was a significant failure of communication between the trial court and defense counsel regarding the admissibility of some of the proffered expert testimony, I respectfully dissent.

I

¶ 67. Wisconsin has a low threshold when it comes to the admission of expert testimony. *State v. St. George*, 2002 WI 50, ¶ 39, 252 Wis. 2d 499, 643 N.W.2d 777. Expert witness testimony is governed by Wis. Stat. § 907.02 (2003–04),[1] which provides that if specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a qualified witness may testify. *Id.* Admissible expert testimony in the form of an opinion or inference is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. Wis. Stat. § 907.04. Further, evidence is "relevant" if it has any tendency to make the existence of any fact more probable or less probable than it would be without the evidence. Wis. Stat. § 904.01. All relevant evidence is admissible unless otherwise precluded by the constitution, statute, or court rule. Wis. Stat. § 904.02. A trial court may preclude certain relevant evidence, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Wis. Stat. § 904.03.

---

[1] All references to the Wisconsin Statutes are from 2003–04.

¶ 68. Once relevancy and the expert's qualifications are established, the reliability of the expert's testimony is a credibility issue to be determined by the fact finder. *State v. Stinson,* 134 Wis. 2d 224, 234, 397 N.W.2d 136 (Ct. App. 1986); *State v. Shaw,* 124 Wis. 2d 363, 367, 369 N.W.2d 772 (Ct. App. 1985). "Whether such relevant evidence should be excluded [] goes to the trial court's discretion to weigh the probative value of the evidence against the possibility of prejudice or other factors which might impede the orderly and expeditious disposition of the issues at trial." *State v. Wollman,* 86 Wis. 2d 459, 464, 273 N.W.2d 225 (1979) (citing *Chapin v. State,* 78 Wis. 2d 346, 353, 254 N.W.2d 286 (1977); *Kelly v. State,* 75 Wis. 2d 303, 319, 249 N.W.2d 800 (1977)). As such, in exercising its discretion regarding expert testimony, the trial court must articulate a reasonable explanation that demonstrates that the court considered whether the probative value of the testimony was substantially outweighed by its potential prejudicial effects, or whether any other statute, constitutional provision, or court rule impacts its admissibility. This decision is guided by, and the result should be consistent with, the State's approach of liberally admitting expert testimony.

¶ 69. Applying the erroneous exercise of discretion standard of review to the facts of this case, the majority concludes that the trial court's decision to exclude the expert testimony was a proper exercise of its discretion in accordance with accepted legal standards and in accordance with the facts of the record. Majority op., ¶¶ 10—17. The majority bases its determination on the fact that the circuit court felt that everything the expert would testify to with respect to the factors that may influence a witness's ability to identify a stranger was within the common knowledge

50

and sense and perception of the jury. Majority op., ¶ 13. The majority further finds fault with defense counsel's inability to articulate the basis upon which the factors influencing the reliability of eyewitness identifications would assist the trier of fact. Majority op., ¶ 14. I respectfully disagree with the majority's analysis and its conclusion.

¶ 70. Numerous factors can influence a witness's ability to accurately identify a person or an event.[2] Such factors include, but are not limited to, (1) the stressfulness of the event for the eyewitness;[3] (2) whether the race, gender, or age of the witness differs from that of the person observed;[4] and (3) whether the event in-

[2] In general, people overestimate eyewitness accuracy and fail to understand the factors that affect it. *See* Gary L. Wells & Elizabeth A. Olson, *Eyewitness Testimony*, 54 Annu. Rev. of Psychol. 277, 284–85 (2003).

[3] *See United States v. Sebetich*, 776 F.2d 412, 419 (3d Cir. 1985) ("There is evidence that stress decreases the reliability of eyewitness identifications, contrary to common understanding.").

[4] *See, e.g., Brown v. Davis*, 752 F.2d 1142, 1146 (6th Cir. 1985) ("Those experienced in criminal trial work or familiar with the administration of justice understand that one of the great problems of proof is posed by eyewitness identification, especially in cross-racial identification.") (citation omitted); *United States v. Telfaire*, 469 F.2d 552, 559 (D.C. Cir. 1972) (The available data, while not exhaustive, unanimously supports the widely held commonsense view that members of one race have greater difficulty in accurately identifying members of a different race . . . . Yet, we have developed a reluctance—almost a taboo—to even admit the existence of the problem, let alone provide the jury with the information necessary to evaluate its impact."); John P. Rutledge, *They All Look Alike: The Inaccuracy of Cross-Racial Identifications*, 28 Am. J. Crim. L. 207 (2001); Peter N. Shapiro & Steven Penrod, *Meta-Analysis of*

51

volved "weapon focus."[5] Just last term, we recognized that "[t]he research strongly supports the conclusion that eyewitness misidentification is now the single greatest source of wrongful convictions in the United States, and responsible for more wrongful convictions than all other causes combined." *State v. Dubose,* 2005 WI 126, ¶ 30, 285 Wis. 2d 143, 699 N.W.2d 582. We should not expect the ordinary person in the community, without assistance, to be able to grasp and comprehend the complicated processes and limitations of how memory, cognition, relative judgment, and transference work.

¶ 71. Furthermore, several recent scientific studies have proven the significant negative impact that certain factors have on an eyewitness's identification of a stranger.[6] As the majority recognizes, these factors

---

*Facial Identification Studies,* 100 Psychol. Bul. 139 (1986) (studies have found that race and gender play a role in the accuracy of facial identification); Daniel B. Wright & Joanne N. Stroud, *Age Differences in Lineup Identification Accuracy: People Are Better With Their Own Age,* 26 Law Hum. Behav. 641 (2002).

[5] Otto H. MacLin, M. Kimberly MacLin, Roy S. Malpass, *Race, Arousal, Attention, Exposure, and Delay: An Examination of Factors Moderating Face Recognition,* 7 Psychology, Public Policy, & Law 134 (2001) (Weapon focus is "the phenomenon whereby the presence of a weapon diverts attention from other aspects of a scene.").

[6] *See United States v. Moore,* 786 F.2d 1308, 1312 (5th Cir. 1986) ("The scientific validity of the studies confirming the many weaknesses of eyewitness identification cannot be seriously questioned at this point."); *United States v. Langan,* 263 F.3d 613, 622 (6th Cir. 2001) ("[T]he science of eyewitness perception has achieved the level of exactness, methodology, and reliability of any psychological research." (internal quotations omitted)).

include the relative reliability of sequential versus simultaneous lineups, relative judgment, transference, the absence of a reliable relationship between the confidence of a witness and the accuracy of the identification, and examples of people wrongly convicted of crimes based solely on an incorrect identification. *See* majority op., ¶ 13. These factors also include, (1) whether the eyewitness is told prior to the photo array or lineup that a suspect has been detained and may be present for the identification;[7] (2) whether the "fillers" match the eyewitness's description of the perpetrator;[8] and (3) whether the eyewitness is given positive feedback during or immediately following the identification.

¶ 72. The defense in this matter was that someone other than the defendant committed these offenses, and that Shomberg was mistakenly identified as the perpetrator. Relying on established scientific research, the expert testimony that he sought to introduce would have addressed factors that have a significant bearing on a witness's ability to identify a stranger, as well as explained how these factors impact the accuracy of a

---

[7] Studies have shown that when eyewitnesses are instructed prior to an identification that the real perpetrator "may or may not be present" in the photo array or lineup and that the investigation will continue regardless of the identification, the instruction can reduce mistaken identification by up to 41.6 percent. Wells & Olson, *Eyewitness Testimony, supra.*

[8] *See, e.g.,* Technical Working Group on Eyewitness Evidence, *Eyewitness Evidence: A Guide for Law Enforcement,* Washington, D.C.: National Institute of Justice, 29 (1999) ("Select fillers who generally fit the witness' description of the perpetrator. When there is a limited/inadequate description of the perpetrator provided by the witness, or when the description of the perpetrator differs significantly from the appearance of the suspect, fillers should resemble the suspect in significant features.").

witness's recollection. Notwithstanding the cross-examination of the eyewitnesses and jury instructions, expert testimony would still have assisted the trier of fact.[9] This testimony would certainly have had a tendency to make the existence of each witness's identification of Shomberg as the perpetrator less probable than it would have been without it, and therefore relevant to his innocence. This court has previously recognized that the ability of a witness to perceive persons, objects, and events, and then to correctly recall and relate those perceptions at trial, is relevant to the credibility of that witness's testimony. *Hampton v. State,* 92 Wis. 2d 450, 455–56, 285 N.W.2d 868 (1979).

---

[9] Jurors often place too much emphasis on eyewitness confidence. *See* Jennifer Devenport et al., *Eyewitness Identification Evidence: Evaluating Commonsense Evaluations,* 3 Psychol., Pub Pol'y & L. 338, 347–48 (1997). *See also Farris v. State,* 818 N.E.2d at 72–73 (Ind. 2004) ("investigators' unintentional cues (*e.g.,* body language, tone of voice) may negatively impact the reliability of eyewitness evidence."). While Judge Fiedler had been informed that Shomberg would waive his right to a jury trial, no waiver had been accepted by the trial court at the time Judge Fiedler made his ruling regarding the admissibility of expert testimony. The court had no way of knowing whether Shomberg would change his mind prior to accepting Shomberg's waiver.

Some studies show that jury instructions "do not effectively teach jurors about how to evaluate eyewitness testimony." Michael R. Lieppe, *The Case for Expert Testimony About Eyewitness Memory,* 1 Psychol., Pub. Pol'y, & L. 909, 923 (1995) (citing Brian Cutler, et al., *Nonadversarial Methods for Sensitizing Jurors to Eyewitness Evidence,* 20 J. Applied Psychol. 1197 (1990)). *See also United States v. Downing,* 753 F.2d 1224, 1230 n.6 (3d Cir. 1985) ("To the extent that a mistaken witness may retain great confidence in an inaccurate identification, cross-examination can hardly be seen as an effective way to reveal the weakness in a witness' recollection of an event.")

Indeed, the trial court in *Hampton* recognized that the expert was permitted to testify regarding those factors which the expert believed could influence eyewitness identifications.[10] *Id.* at 458. *See also Stinson,* 134 Wis. 2d at 235 (where the court of appeals concluded that bite mark evidence presented by an expert witness can be a valuable aid to a jury in understanding and interpreting evidence); and *Shaw,* 124 Wis. 2d at 368–69 (where the court of appeals concluded that the expert witness's testimony that fingernail clippings could be useful for identification purposes and that the defendant's clippings matched those found at the scene tended to make the fact of defendant's guilt more probable than it would be without the evidence).

¶ 73. Defense counsel raised these issues concerning the admissibility of Shomberg's expert witness testimony prior to the trial. The areas of testimony sought were included in the motion. The background and qualifications of the expert were attached to the motion. Defense counsel attempted to explain the relevance of the testimony in the pretrial hearing prior to

---

[10] In *Hampton,* this court assumed that some expert testimony should have been permitted that would make available to the jury the scientific evidence the defendant deemed necessary for the determination of the issue. *Hampton v. State,* 92 Wis. 2d 450, 455–56, 285 N.W.2d 868 (1979). This court nevertheless upheld the limitations that precluded the expert from applying those factors to the concrete circumstances of that case and from giving his own opinion as to the reliability of the identification of the defendant. *Id.* at 458–59. The majority, sub silencio, now apparently rejects this assumption that was readily accepted in *Hampton,* and would allow a trial court to preclude scientific evidence concerning eyewitness identifications and the factors that can influence them from being presented to the jury, notwithstanding its relevance.

the waiver of any jury.[11] Because the scientific analysis of perception and memory recollection is beyond the general knowledge and experience of the average juror, as well as many judges, there can be no doubt that the testimony of the expert *would have assisted the trier of fact.* Cross-examining the eyewitness is simply no substitute for expert testimony regarding the witness's ability to make a correct identification.[12]

¶ 74. In this matter, it is obvious that what we have here is failure to communicate between the trial court and defense counsel. The whole point of calling an expert witness to the stand is to provide the trier of fact with information in the form of testimony it would not otherwise have available to it in rendering a decision in contested litigation. Such testimony was available to the trier of fact in this action, but the trial court excluded that testimony from the evidence. Because relevance is the standard for admissibility under Wis. Stat. § 907.02 and the proffered expert testimony in this case is relevant, because the proffered expert testimony would assist the trier of fact, and because the witness in this case is qualified to give the testimony proffered,[13] I would conclude that the decision of the trial court to exclude the expert testimony regarding the factors surrounding eyewitness identification was clearly erroneous.

---

[11] Unlike the majority, I conclude that counsel's efforts at presenting the issue before the trial court more than satisfied the requirements of Wis. Stat. § 901.03(1)(b). The substance of the testimony was made known to the judge in the motion, the attachment to the motion, and at the hearing prior to the jury waiver and the trial.

[12] *See, supra,* n.9.

[13] This was not contested at the trial court level.

## II

¶ 75. In a criminal trial, an accused's right to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.[14] The right to call witnesses on one's own behalf has long been recognized as essential to due process. *Chambers v. Mississippi,* 410 U.S. 284, 294 (1973); *In re Oliver,* 333 U.S. 257, 273 (1948). At a minimum, criminal defendants have "the right to put before the [trier of fact] evidence that might influence the determination of guilt." *Taylor v. Illinois,* 484 U.S. 400, 408 (1988) (quoting *Pennsylvania v. Ritchie,* 480 U.S. 39, 56 (1987)). Few rights are more fundamental. *Webb v. Texas,* 409 U.S. 95, 98 (1972); *Washington v. Texas,* 388 U.S. 14, 19 (1967). This right is an essential attribute of the adversary system itself. *Taylor,* 484 U.S. at 408–09 (citing *United States v. Nixon,* 418 U.S. 683, 709 (1974)).

¶ 76. An accused does not have an unfettered right to offer testimony that is "incompetent, privileged, or otherwise inadmissible under standard rules of evidence."[15] *Taylor,* 484 U.S. at 410; *Chambers,* 410 U.S. at 302. Accordingly, this court has developed a two-part

---

[14] The constitutional right to present evidence is grounded in the Confrontation and Compulsory Clauses of Article I, § 7 of the Wisconsin Constitution and the Sixth Amendment to the United States Constitution. *State v. Dodson,* 219 Wis. 2d 65, 72, 580 N.W.2d 181 (1998).

[15] The majority asserts that *United States v. Scheffer,* 523 U.S. 303, 308 (1998), has narrowed the Court's holding in *Taylor v. Illinois,* 484 U.S. 400, 408 (1988), with regard to a defendant's right to present a defense. Majority op., ¶ 35. However, *Scheffer* cites *Taylor* with approval and simply recognizes some of the types of limitations discussed in *Taylor.* These "other legitimate interests" that may constitutionally limit a defendant's right to present eyewitness testimony are the established rules of evidence. As *Taylor* explicitly recognized, a defendant does not

inquiry with respect to a defendant's constitutional right to the admissibility of proffered expert witness testimony. *St. George,* 252 Wis. 2d 499, ¶ 54.

¶ 77. First, the defendant must satisfy each of the following four factors regarding admissibility:

1) The testimony of the expert witness [meets] the standards of Wis. Stat. § 907.02 governing the admission of expert testimony.

2) The expert witness's testimony [is] clearly relevant to a material issue in this case.

3) The expert witness's testimony [is] necessary to the defendant's case.

4) The probative value of the testimony of the defendant's expert witness outweigh[s] its prejudicial effect.

*Id.* (footnotes omitted). Second, if the defendant satisfies these four factors to establish a constitutional right to present expert testimony, a court must determine whether the defendant's right to present the proffered evidence is nonetheless outweighed by the State's compelling interest to exclude the evidence. *Id.,* ¶ 55.

¶ 78. As to the first part of the inquiry, the majority concludes that the first, second, and fourth factors are arguably met (making no assessment about the qualifications of the expert). Majority op., ¶ 28. The majority focuses on the third factor, concluding that the

have an unfettered right to present testimony that is "incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor,* 484 U.S. at 410. Following the *Taylor* rationale, *Scheffer* upheld a rule that made polygraph evidence inadmissible because it was consistent with other rules of evidence regarding the reliability of evidence, and therefore did not "implicate a sufficiently weighty interest of the defendant to raise a constitutional concern." *Scheffer,* 523 U.S. at 309.

defendant failed to establish that the expert eyewitness testimony was necessary to his case. *Id.* The majority reasons that defense counsel was able to convey adequately the concepts of relative judgment and recognition memory, as well as the factors relevant to the unreliability of eyewitnesses' testimony, in his cross-examinations of each of the eyewitnesses. *Id.* The majority is mistaken. Although cross-examination may have touched upon each witness's perceptions and recollections of the event in question, cross-examination did not allow the defense the opportunity to explain to the trier of fact how the factors that impact the perception, memory, and recollection, as established through scientific research, would have affected the ability of each witness to correctly identify the perpetrator of these offenses.

¶ 79. Furthermore, the majority's reasoning fails to properly take into account what would satisfy the "necessary to the defendant's case" prong from *St. George,* and therefore leads to a faulty conclusion. In *Taylor,* the United States Supreme Court ruled that, under the Sixth Amendment, an accused not only has the right to confront the prosecution's witness through cross-examination in order to challenge their testimony, the accused also "has the right to present his [or her] own witnesses to establish a defense. This right is a fundamental element of due process of law." *Taylor,* 484 U.S. at 409 (citation omitted). The right to present the testimony of witnesses "provides the defendant with a sword that may be employed to rebut the prosecution's case." *Id.* at 410. "The decision whether to employ [that right] in a particular case rests solely with the defendant." *Id.* But that right includes "the right to put before [the trier of fact] evidence that might influence the determination of guilt." *Id.* at 408 (quoting *Ritchie,* 480 U.S. at 56).

¶ 80. The majority asserts that " 'as in *Scheffer,* the court ... heard all the relevant details of the charged offense from the perspective of the accused,' and the exclusion of expert testimony 'did not preclude him from introducing any factual evidence.' " Majority op., ¶ 36 (citing *United States v. Scheffer,* 523 U.S. 303, 317 (1998)). The majority points out that Scheffer was merely precluded from " 'introducing expert opinion testimony to bolster his own credibility,' and therefore concluded that 'respondent's defense was [not] significantly impaired by the exclusion ....' " *Id.* This is not what occurred here. The defendant did not offer the expert testimony merely to bolster his credibility. Instead, the defendant offered the expert testimony to address factual concerns, rooted in scientific studies, regarding the problems inherent in eyewitness testimony. Had the proffered testimony been merely cumulative, I would agree with the majority. It is not.

¶ 81. Expert testimony becomes necessary to the presentation of the defense if it might influence the determination of guilt or innocence. Given the facts here that Shomberg's defense was that someone else committed these offenses, that the victim could not identify him at all but picked him out of the lineup because he was the best of six in the lineup, and that the other witness was told that a lineup would be performed after the suspect was caught, and he was only 90 percent sure of his identification, I would conclude that the testimony of the expert witness, under these circumstances, certainly could affect the determination of guilt or innocence in this case. Consequently, this evidence was necessary to the defendant's case. While Shomberg may have been able to cross-examine each of the eyewitnesses, he was nevertheless deprived of his

opportunity to present his own witness with respect to the factors that impact eyewitness identification.

¶ 82. Having concluded that Shomberg has satisfied all four factors in the first part of the *St. George* inquiry, I also conclude that the State has failed to satisfy the second prong, that it had a compelling interest to exclude the evidence. Accordingly, the exclusion of Shomberg's expert testimony violated his constitutional right to present a defense.

### III

¶ 83. The State argues that even if the circuit court erred in excluding the expert witness testimony in this case, the error is harmless. I disagree. Where the exclusion of the evidence deprives a criminal defendant of the constitutional right to present a defense, the harmless error rule is inapplicable. *See State v. Pulizzano,* 155 Wis. 2d 633, 655–56, 456 N.W.2d 325 (1990); *State v. Stutesman,* 221 Wis. 2d 178, 187–88, 585 N.W.2d 181 (Ct. App. 1998).

### IV

¶ 84. The circuit court's decision to exclude Shomberg's expert witness from testifying about the factors that have a bearing on an eyewitness's ability to identify a stranger was clearly erroneous. Shomberg was therefore deprived of his constitutional right to present a defense. In addition, the harmless error rule is inapplicable under these circumstances. I would therefore reverse the judgment of conviction, and remand this matter to the circuit court to conduct a new trial. Accordingly, I respectfully dissent.